$9568/0001
E

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

HOME RUN THE MOVIE, LLC     )
                             )
      Plaintiff,         )
                             )
    -against-        )
                             )
WAKING GIANTS MEDIA GROUP, )
LLC d/b/a WAKING GIANTS, LLC, )
                             )
      Defendant.      )

**JUDGE CROTTY**

Case No.

# 13 CV 0073

JAN 0 3 2013

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, 1446, Defendant, Waking Giants Media,

LLC ("Defendant"), hereby removes <u>Home Run the Movie, LLC v. Waking Giants</u>

<u>Media Group, LLC d/b/a Waking Giants, LLC</u>, filed in the Supreme Court of the State of

New York, County of New York, Index No. 654220-2012 (the "Action"), on the ground

that this Court has original jurisdiction of the Action under 28 U.S.C. §§ 1332, 1441.  In

support of this Notice of Removal, Defendant states as follows:

1.     Plaintiff, Home Run the Movie, LLC ("Plaintiff"), initiated the Action on

December 4, 2012 by filing a Verified Complaint, which is attached hereto as Exhibit 1.

On December 17, 2012, Plaintiff filed a First Amended Verified Complaint, which is

attached hereto as Exhibit 2.

2.     Defendant was notified of the Action on December 4, 2012.  Defendant has

not been served.

3.     This Notice of Removal is timely under 28 U.S.C. § 1446(b).

4.    Plaintiff is an Oklahoma limited liability company with its principal place of business in Oklahoma.  (See Ex. 2, Pl.'s First Am. Verified Compl. at ¶ 4.)

5.    Defendant is a Delaware limited liability company (see Ex. 3, Def.'s Certificate of Formation) with its principal place of business in Arizona.

6.    According to Plaintiff's First Amended Verified Complaint, the matter in controversy in the Action exceeds the sum or value of $75,000.00, exclusive of interest and costs.  (See Ex. 2, Pl.'s First Am. Verified Compl. at 19-21.)

7.    Removal under 28 U.S.C. § 1441 is proper because this Court has original jurisdiction of the Action pursuant to 28 U.S.C. § 1332.

8.    A copy of the Summons to Defendant is attached hereto as Exhibit 4.

9.    Defendant shall give notice to Plaintiff and the Clerk of the Supreme Court of the State of New York, County of New York as required by 28 U.S.C. § 1446(d).

WHEREFORE, Defendant gives notice that the Action is hereby removed to this Court, and hereby requests that this Court retain jurisdiction of the Action for all further proceedings.

Respectfully Submitted,

Evangelos Michailidis, EM-3383
Duane Morris LLP
1540 Broadway
New York, New York 10036-4086
Telephone: (212) 471-1864
Facsimile: (212) 214-0650
emichailidis@duanemorris.com

and

Ryan S. Wilson, OBA No. 14340
(Motion for Pro Hac Vice to be filed)
Derek B. Ensminger, OBA No. 22559
(Motion for Pro Hac Vice to be filed)
Hartzog Conger Cason & Neville
201 Robert S. Kerr Avenue, Suite 1600
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-7000
Facsimile: (405) 996-3403
rwilson@hartzoglaw.com
densminger@hartzoglaw.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------ x   :

HOME RUN THE MOVIE, LLC                               :

     Plaintiff,                    :

    -against-                           :

              Index No.

WAKING   GIANTS   MEDIA   GROUP,   :
LLC dba WAKING GIANTS, LLC,                           :

     Defendant.                    :

------------------------------------------------ x

### VERIFIED COMPLAINT

  Through its counsel, Theodore L. Blumberg, Plaintiff states under penalty of perjury that:

### I. Introduction

  1. Waking Giants's deceit, incompetence, and chronic failure to fulfill contractual obligations large and small, are the story of this case, which illustrates, among other things, defendants' bad faith, bungling, and audacity.

  2. Boiled down to its essence, defendant breached its contractual obligations to plaintiff Home Run. When Home Run member and executive producer Carol Spann Mathews availed herself, on Home Run's behalf, of the cancellation clause in the contract (which defendant drafted) defendant, through member Kenneth C. Herfurth, accepted the cancellation, waived the cure period, and ended the agreement.



3.     Herfurth, on information and belief a founding member of defendant, was desperate to replenish his coffers after his personal bankruptcy in March of this year. (That bankruptcy came on the heels of a multimillion dollar judgment against Herfurth arising from an action for, among other things, breach of contract and breach of the covenant of good faith and fair dealing,[1] which appear to be a pattern of Herfurth's.) He tried to rescind Waking Giants's acceptance of the cancellation and is now, absurdly, demanding payment for the full contractual period, as well as payments to vendors and service providers, some or all of which, on information and belief, are fraudulently inflated or entirely fabricated.

**II.     The Parties**

4.     Plaintiff Home Run Movie, LLC is an Oklahoma limited liability with its principal place of business located at 3939 South Harvard Avenue, Tulsa, OK 74135.

5.     Waking Giants Media Group, LLC, on information and belief, is a limited liability company[2] Kenneth C. Herfurth, Erik Lokkesmoe, and Corby Pons formed in 2012. Waking Giant's principal place of business is located at 247 W. 30th St., 4th Floor

---

[1] *Brown's Custom Fence Co., Inc. v. BCF Acquisition, LLC, Kenneth & Jodi Herfurth, et al.*, No. CV 2010-015209 (Sup. Ct. AZ, Maricopa Cty., filed 5/18/10).

[2] A nationwide search of databases failed to locate any information about the state in which Waking Giants formed its LLC. The Waking Giants website boasts that the company has a presence in New York, California, and Arizona but the company is apparently not registered in any of those states, nor did a search of the Delaware database turn up information. If it turns out that Waking Giants is an LLC in name only, plaintiff reserves its right to amend the Verified Complaint to proceed directly against Herfurth, Pons and Lokkesmoe individually, and to add additional causes of action for fraud.

New York, NY 10001.[3]  Also on information and belief, Herfurth is a resident of Arizona;

Lokkesmoe is a resident of New York, and Pons is a resident of California.

### III.    The Facts

6.    Home Run was formed to produce a motion picture entitled "Home Run." That picture is currently thriving and on schedule in the phase of creation known as marketing and distribution.

7.    At all times relevant to this action Waking Giants held itself out as a company expert in publicizing and distributing motion pictures.[4]

8.    Waking Giants's assertions of expertise and experience are fraudulent and were made with the intent to deceive Home Run. On information and belief, Waking Giants, which was likely formed in 2012, has no track record in the motion picture industry.[5] A leading entertainment industry website, imdbpro.com, as of the date of this pleading, has no listing whatsoever for Waking Giants—no credits, no motion pictures in production or motion pictures that have been produced.

---

[3] See http://wakinggiants.co/#!contact.html (last visited 11/27/12).

[4] Without a distribution deal, a motion picture is like the proverbial tree that falls in the woods with no one to hear it. Major distributors "exert tremendous power and influence over what films are made, not just by providing financing, but also by providing access to the domestic theatrical marketplace in a manner no other organizations can match." Bill Daniels, David Leedy, & Steven D. Sills, *Movie Money* 5 (2d ed. 2006).

[5] Mathews knew that Waking Giants was a new company; however, Herfurth, Lokkesmoe, and Pons fraudulently misrepresented the extent of their experience and the depth of their relationships in the motion picture industry to induce her to hire them, in reliance on their fraudulent assertions. And they succeeded in deceiving her. Furthermore, they apparently intended to use Home Run to train themselves—at Home Run's expense.

9.     On information and belief, Waking Giants' members, Herfurth, Lokkesmoe, and Herfurth have no meaningful experience distributing motion pictures, nor do they have meaningful credits as motion picture publicists. Pons's sole credit on imdbpro.com person who received a "special thank you" in connection with a motion picture,[6] Lokkesmoe's occupation is listed as "actor" and his sole listed credit is for a short film entitled "Behind the Praise Band."[7] in a short film, and Herfurth has two "executive producer" credits,[8] discussed below.

10.     Defendant Herfurth, on information and belief, has a string of failed businesses to his credit, and his bankruptcy petition was granted this year under Chapter 7 of the Bankruptcy Code.[9]

---

[6] http://pro.imdb.com/name/nm3412700/ (last visited 12/3/12). Imdbpro.com is subscription-based website that requires a monthly fee. The stripped-down version available to the public free of charge iterates the above information for Pons. http://www.imdb.com/name/nm3412700/?ref_=fn_al_nm_1 (last visited 12/3/12).

[7] http://pro.imdb.com/name/nm1698936/ (last visited 12/3/12). See also http://www.imdb.com/name/nm1698936/?ref_=fn_al_nm_1 (last visited 12/3/12).

[8] Although "executive producer" sounds higher and mightier than the unadorned "producer," in motion picture industry argot "producer" is by far the more meaningful title, and indicates a direct hands-on relationship to the project. See Christine Vachon, *A Killer Life* 8 (2006)("[I]n film, the credit 'executive producer' can be a symbolic gesture, a title doled out as a favor . . . ."). The title "executive producer" title is notoriously broad and can connote a person experienced in the motion picture industry who helped obtain financing, to a "local real estate magnate . . . a 'sugar daddy' . . . or merely Mom and Dad." Dov Simens, *From Reel to Deal* 29 (2006). Notably, to qualify as a producer with the Academy of Motion Picture Arts and Sciences, "you've got to have at least two sole producer screen credits—not executive producer, not co-producer . . . Just producer." *A Killer Life* at 8.

[9] United States Bankruptcy Court, Dist. Of Arizona (Phoenix), Petition 2:11-bk-21791-RTB. The filing was submitted on 7/28/'11 and Herfurth and his wife received a discharge on 3/6/'12.

11. Although Pons and Lokkesmoe told Mathews that Herfurth was the business expert behind Waking Giants, Herfurth lacks relevant experience and success in publicizing and distributing motion pictures. On information and belief, Herfurth's experience in the motion picture industry is limited to an executive producer credit for a picture called "Seven Days in Utopia"[10] from which Herfurth, by his own account, was fired from.

**Home Run meets "Waking Giants"**

12. Home Run's executive producer Carol Spann Mathews met Lokkesmoe and Pons through a consultant to Home Run. The consultant advised Mathews that Lokkesmoe and Pons might be good candidates for publicizing the picture. At the time, the consultant was familiar with Lokkesmoe and Pons because of Lokkesmoe and Pons's involvement with a publicity firm called "Different Drummer."[11]

13. Led by Herfurth, the three Waking Giants members fraudulently induced Home Run to enter into a contract with Waking Giants. (A copy of the contract is attached and incorporated herein by reference as Exhibit A.) The crux of the fraudulent inducement can be found in, among other items, fraudulent assertions that Waking Giants:

---

[10] http://pro.imdb.com/name/nm4002552/ (last visited 11/27/12).

[11] Different Drummer has one film to its credit, on which it provided publicity. http://pro.imdb.com/company/co0252346/maindetails (last visited 11/28). The film is listed as a documentary titled "Call and Response." The link to the Different Drummer website (www.differentdrummer.com), when clicked, takes one to a spare page titled, "Demand, the Movie" and features a fill-in box requiring the viewer to provide name, address, etc., below the question, "Want to get in on the action?" http://www.differentdrummer.com/ (last visited 11/28/12.)

a)     is able to "bring customized distribution and marketing services" (Ex. A at 2), to the motion picture when, in fact, Waking Giants has no suitable industry contacts or affiliations;

b)     "brings proven industry leadership and results" (Id.) to the motion picture when in fact it has no track record of the relevant kind in the industry, let alone "proven . . . leadership;"

c)     "will be leveraging all of its existing . . . relationships [and] contacts" (Ex. A at 3) for the motion picture's benefit. As noted, Waking Giants was and is an industry tyro run by a newly bankrupt and chronically unsuccessful businessman, and two other members with apparently no experience distributing motion pictures; and

d)     Defendant asserted that Home Run would be its priority project during the contractual period, that they had passed on other projects to take on Home Run, would not be juggling other projects, and would thereby provide Home Run copious attention.

14.     Defendant also bound itself to a series of promises and obligations under the contract, and in assertions leading up to the contract, and repeatedly failed to meet them. By way of example but not limitation, the contract states, "As partners with Home Run, *Waking Giants shall provide the following distribution and marketing services:*" (Ex. A at 4)(emphasis in original).

a)     "Direct and active participation as part of the leadership team . . . to develop, design and execute distribution and marketing for Home Run." (Id.) Defendant's members continually missed critical meetings, were frequently absent or unavailable to

participate in the "leadership team," and defendant failed to develop, design, or execute distribution and marketing for Home Run. Indeed, the marketing plan defendant formulated comprised nearly no new ideas or strategies (and was largely no different from Mathews's marketing plan, developed for investors nearly two years earlier). This rehashing was in contrast to a key element of their sales pitch to Mathews, when they fraudulently asserted that their stock in trade was innovative approaches.

        b)     Defendant was to prepare "A comprehensive budget supporting the distribution and marketing plan for the project." (Id.) Defendant provided only an Excel spreadsheet with generalities, and never meaningfully met this obligation.

        c)     Defendant was to create and execute "a comprehensive, coordinated and compelling marketing campaign." Defendant promised to provide a number of different strategies. (Id.) Defendant never met this obligation—in the sixty days the parties worked together, defendant never provided any of the promised strategies.

        d)     Defendant was to manage and execute a "national audience acquisition, activation, and acceleration campaign" (Ex. A at 4). Defendant never met this obligation.

    15.    Defendant's fee was $750,000. (Ex. A at 9.) Home Run was required to pay, and paid, $37,500 when the contract was signed on August 17, 2012. And Home Run was required to pay, and paid, $75,000 per month thereafter, until October 17, 2012 when Home Run canceled the contract, as discussed below. Had the contract remained in effect, Home Run's final payment would have been due June 10, 2013.

**Defendant Ignored Home Run's Queries and Complaints**

16.     Frustrated by Defendant's failure to live up to its obligations, and hoping to provide a tangible basis from which to correct those failures, on September 2, 2012, Mathews sent Defendant a detailed email stating, in relevant part:

. . . I wanted to give you all some initial feedback in writing so you all could collect your thoughts/responses between now and when we chat on the phone. It will help our call move more quickly if you have some initial thoughts from us since we have so many . . . First. The book was very pretty. It also probably provides us with a *necessary* template to begin conversations that will no doubt dive deeper. And, of course, I know that we were going to be shading in the details as the year goes on so there was no way for you to do that over a two week period. Yet, as pretty as it was, this felt more like a pitch that we might have received by you guys at the Amarano (a local restaurant) than a custom marketing campaign; honestly, there is a little disappointment in that we thought there would be actual strategy, some ideas we hadn't thought of, maybe something "different" and a little less boiler plate stuff.

Some overarching things I would have liked to see was this:

1) What are the goals? What does success look like? 750,000 opening weekend or opening night? What about the rest of the theatrical phase?[12]

2) What are the benchmarks along the way? Where will we assess if we are on track to our 750,000 whatever and what are the target numbers for those benchmarks? B1000s---how many by when? When will we determine how many theaters? What will be our factors for determine theaters? Just b1000s? What else? What are the social media goals that are MEASURABLE? how do you measure them? What does success look like there and when do you think we will get to certain places in the social media landscape that will tell us we are on the right---or wrong---track? Biggest issue for Tom and me: there is no way for us to manage if we cannot see the targets and how we well we are moving toward them![13]

3) How and who will assess when an opportunity is on track with where we are going? What are you all going to do to avoid the "spray and pray" technique you hate so much? What makes a partner a good partner---? Or an interview possibility? Or a media outlet?   What makes a relationship a great one? This all needs to be defined so we can work in lockstep and not waste time or money.[14]

4) There has been a lot of discussion about data capture and shifting and moving our plans based on what we are learning as we chat over Diet Coke at the Amarano and eggs and bacon at Bob's. But no mention of it in the proposal.[15]

---

[12] Defendant never answered this question.

[13] Defendant never responded.

[14] Defendant never responded.

[15] Defendant never responded to Mathews's mention of plans for collecting and owning data.

5)  *There is a lot of same ol' stuff in this proposal as in others which I am certain is necessary order of movie marketing business. But it'd be awesome if we knew the 'why' behind them from your perspective. Again--helps us work with you as a team if we understand your thinking and it avoids us pushing ideas to each other that will simply not work . . .*[16]

Theatrical:  And you talk about one-sheets and trailer placement but what about the important issues around advance ticket sales at the theater (which is a huge deal)?  We can't have people get 1000 ticket commitments and then give them 6 days to get their tickets to 1000 people.

Event Licensing:  I love the idea of a fresh approach!!  Would like to know the problem with the old approach that you are solving and how you will evaluate the risk vs reward of trying something new. How does this improve things and how will the pastor experience it?  In other words--what are the advantages of the new approach.

Home Entertainment:  Goals?  Target partners?  What does a good relationship deliver for us so we know it when we see it?  Estimated revenue?[17]

VOD:  Revenue projection, but the one you mention has no articulated basis--?  *Where did you come up with $2mil on a $10 mil box office?  What is your target partner here and why?*

Foreign:  Great--a mention of a partner.  But of course, we will be evaluating more than these.  Again--what does a good partner deliver so we know when we find them?  Estimated revenue goals?[18]

TV:  No mention?[19]

PAGE 11[20] - . . . I thought you all wanted to avoid certain trades b/c we wouldn't do well there.  Yet they are mentioned here . . . Are there stats on which you base your enthusiasm?[21]

PAGE 12 - Publicity timeline - again.  *This all looks good but the whys and the goals are not here so it just looks like a random to do list.*  I'm sure you have reasons but if you would articulate them it would help us operate more as a team.  When is a publicity opportunity too early or not a good fit?  When do we find out we need to do more b/c our results (which are what?) are not manifesting as we hoped?

---

[16]  Despite paying lip service to the "team" concept Defendant never provided Home Run the materials what would have allowed it to work in tandem with Defendant.

[17]  Defendant never answered these questions.

[18]  Defendant never responded, and similarly neglected its promise to prepare a pitch aimed at prints and advertising distributors, with targets for every revenue stream.

[19]  Defendant--a would be distributor--never responded to the question about television, a potentially vastly significant revenue stream for the picture.

[20]  Page numbers in the email refer to a document Defendant provided to Plaintiff which was supposedly a detailed marketing and distribution plan.

[21]  Defendant did an about-face, advocating positions it had ruled out in meetings.

PAGE 14 -   What are we going to do and when will we focus on motivating and mobilizing this huge ground force???[22]  This needs a focused plan with good ideas.

PAGE 15 - Church Engagement – other than the obvious stalls that come with a transition, what are we going to do here to increase our church engagement successes?  what are our weaknesses and how are we going to fix them?  How are we qualifying churches that are outside the CR community?  What are you bringing to this effort by way of church relationships?  (pastors wives thing? what does success look like there?)  [23]How many churches are we going to 'touch' through our efforts.  How many churches should be engaged on some level between now and Jan?  Jan through Apr? . . .

PAGE 17 - MICRO SCREENINGS - there is so much more that needs to be discussed here.  Why 50 micros?  Why not 40 or 60?  What makes it a good decision?  Would micro screenings open possibilities for blessing our strategic partners?  Also the leader screenings.  Define "representative" at every screening.  Do we worry that the RSVP / ticket response is asking for people to bring their family? friends?[24]  I do.

PAGE 18 - ADVERTISING - this is very parochial.  Need to understand what and why, i.e.: Why KLOVE? Salem?  I get [sic] you have answers.  I just want them.  What are the 'active moviegoing sites?'

PAGE 22 - DEMAND THE MOVIE[25] - Very concerned that we are undermining the existing b1000 effort.  True--it is very high shelf, to use your words, it is also 'out there' and we have to manage it--the good and the bad.  Our concern is that, if we offer DTM and a 500 trigger, then the folks that have put themselves on the line for the b1000 campaign feel hoodwinked . . .

PAGE 24 - MARKETING COLLATERAL - For the record, I'm still lacking the reason for wanting to change things.  It's important.  If I understand the actual reasons to change the poster, it'd help me for now and ever more.  Different is not always better.  I can wait on the poster and just see it when I see it--but that is not a cost productive way to run most of the upcoming decisions.  Which brings me to the trailer.  *There are very specific reasons the trailer is what it is---if we change the trailer, I need to know what and why BEFORE we go to the great expense of actually doing it . . .*

PAGE 25 - *LEADERSHIP STRUCTURE is lacking any meaning on every level.  It looks like we are separate and detached except at the CR church engagement piece.  Everything is ultimately my responsibility and should be reflected in the chart or why have it.  Everyone else should have an area.  WG cannot have three heads.  Responsibilities have to be delineated and indicated in the org chart or why have it? . . . . There is no indication of who's handling money management.  Who is managing data collected and assessing?  This page causes me concern as I think you all are in denial about the reality of our relationship--and or, possibly, how to structure a real org*

---

[22] Defendant never answered this question.

[23] Herfurth fraudulently claimed he had vast experience with Church Engagement.  When asked for detail, he claimed he had done "research." And proceeded to try to pick Home Run's contractor's brain for information about this potentially important market for the picture.

[24] Defendant never answered this question.

[25] "Demand the Movie" is a product that Defendant wanted to develop at Plaintiff's expense— literally, with Plaintiff subsidizing the product's development.

10

> *chart imperative to manage any project of this girth*. It's probably the former. Again. We need to have a call or face to face meeting that addresses just this. An honest and real org chart will help our ongoing long distance communication in every way imaginable. It will lessen distractions, heighten productivity and nurture the team morale. A true, working org chart invites the right people to the right meetings and insures people know who to go to for questions. Too much going on to have a three-headed monster copied and weighing in on all things. I know you guys know all of this—but we need to change this document . . . .

(Email from Carol Spann Mathews to Defendant, dated 9/2/12)(emphasis added).

17.     Instead of providing a substantive written response, two days later Lokkesmoe and Herfurth derided and scolded their client. Mathews, during a telephone call. Indeed, Herfurth had the audacity to scold Mathews for putting her concerns in writing!

18.     Defendant's nonfeasance and careless disregard of its obligations continued and worsened. Defendant, for example, made much of the fact that it would afford Home Run a presence at a critically important event run by an organization called Catalyst. Defendant used Home Run's money to attend the event to further projects that had nothing to do with Home Run—in violation of its contractual obligations and fiduciary duties. Mathews sent Defendant an email about the debacle:

> [Y]ou never really embraced what I wanted which was a **legitimate** presence at the largest Catalyst event of the year. I asked a dozen times what our presence was going to be and got fast answers and loose references . . . I trusted your judgment that we didn't all need to be there, en masse, with a booth, and etc. And yes—the twitter thing was a very a good idea—but didn't do well b/c it wasn't pushed from a booth—or a podium. So it was a miss, too.
>
> Here's the note I received from a state rep at Catalyst. In nearly 3 years of working with CR—I have never had an email like this. It is bad for ALL of us if this type of report makes it back to John Baker.
>
> > Good Morning Carol, I am disappointed with the lack of presentation of Home Run at Catalyst. Yes there was the ad in the event book and the card in the bags, but what lacked was an introduction to the film before they showed the trailer. They showed it after about 4000 had already left for the day and that pile of 20 plus shirts sat untouched the entire time. It may of been all that was allowed I don't know. According to the list of sponsors, home run was one, but the only one there without a booth. But, at least we got what we did. Just my opinion. I guess I was expecting more! I am glad God is in charge of this.....we did hear questions about it and we answered the ones were heard.

11

Praying for a great One Day in Maine and please give Marnie a hug for me. Thanks
Debbie

I gathered by the lack of your own communications (twitter, or otherwise)...and then was
confirmed by the above note, that we didn't have much show at all there. And, how was it that
there was a pile of shirts *anywhere* and it be seen by *anyone*? It's not the shirts that matters, of
course, it's the reflection of the attention given to the event by our man/men on the ground.

If you knew it was going to be exactly what it was, I wish you would have told me sooner,
instead, I've shared with others that we were there---I encouraged your (now I realize--B.S.)
tweet about Catalyst---and Home Run at Catalyst really wasn't anything and now I'm
embarrassed for those from CR who were there and saw our weak presence for themselves.
The last thing we can do is lose the confidence of this important core---and it starts with the
state reps who emailed me! It also does NOTHING for Waking Giants' credibility---people have
their eyes on you b/c you got "Home Run"---the stupid tweets about the nothing at Catalyst was
a bad idea. The 2 photos on Home Run FB? Also bad. It's smoke and mirrors and your
competition is going to call you on it. And so will John Baker.

I feel this lack of showing at this huge event of our absolutely target-middle audience was a
miss. John Baker asked me about it TODAY---he knows it was important. (thank God I hadn't
seen Debbie's email) **What should I say to him as to how we are going to connect with this
crowd between now and April 19?**[26]

Please let me know what we spent for the East show--including your travel---and give me a
bullet list of what you think might have been accomplished.[27] Also compare that to what it cost
for other "sponsors."

And while I understand that you think it will be so great to be at Catalyst WEST, I'm need to
understand why you think we would spend *that* money at *that* time.[28] It happens the same week
as Opening Weekend.

Please let me know what shows we are planning on attending---what are presence will be
specifically---what we are spending---and what the thinking is (the why / the who / the
measurable outcome). A calendar would be nice. Perhaps you have already populated the
calendar on base camp? (BTW---I texted you an hour ago---there is no access to
BaseCamp...says account needs updating.) Please let me know when the conference calendar
and associated plans and budget can be expected.

We need to do better. I'm sure you agree.
Carol

(Email from Carol Spann Mathews to Defendant dated 10/6/12)(emphasis in original).

---

[26] Defendant never answered this question.

[27] Defendant never responded.

[28] Defendant never responded.

**Herfurth's tantrum and personal attacks on Mathews**

19.    Defendant continued to disappoint Home Run. Important meetings and telephone conferences that Defendant was supposed to attend through one its members were forgotten or ignored. Fundraising efforts were more apparent than real. Materials and strategies that were supposed to have been provided were withheld, or so amateurish they required complete overhauls. Faced with Defendant's continued breaches, negligence, and incompetence, Home Run invoked the contract's cancellation clause on October 17, 2012. On that date Carol Mathews spoke with Herfurth and Erik Lokkessmoe, explained Home Run's disappointment with Defendant's breaches, and Herfurth accepted her cancellation, even though it was oral rather than written. Herfurth, however, began yelling at Mathews. He demeaned her personally and professionally, screaming that she had been "a bad partner" and he demeaned the motion picture, and stated that Waking Giants did not wish to continue working with Home Run.

20.    The upshot and aftermath of the tirade, however, is that Herfurth did waive the contract's cure period. His acceptance of Mathew's oral cancellation and waiver of the cure period is confirmed by his email to her the following day. The email states, in pertinent part, "Waking Giants acknowledges that you/Home Run provided notice of Waking Giants' termination yesterday Oct. 17, 2012." (Email from Kenneth Herfurth to Carol Spann Mathews dated 10/18/'12.) Herfurth goes on to state, "Although our agreement contemplates written notices, we accept the verbal notice provided yesterday." (*Id.* ¶1.)

13

21.     Herfurth failed to invoke the contract's 15 day cure period.

22.     Herfurth correctly next asserted, inaccurately, that "Our agreement with Home Run does not have a specific termination clause in place but does provide an outline and process for a 30 day termination period." (Id.)

23.     Contrary to Herfurth's statement, the contract contains a specific termination clause. Also contrary to Herfurth's statement, it does not contain "an outline and process" for a 30 day termination period. To the contrary, the contract contains the aforementioned 15 day cure period that Herfurth waived, and which provides that the failure to cure within the 15 days gives the "non-breaching party . . . the right to terminate the Proposal without further notice." (Ex. A at 10.) As noted, Herfurth waived the cure period and tried to dupe Mathews into accepting a "30 day termination period" he concocted of whole cloth.

24.     Herfurth's email (Ex. B) lists mostly unsubstantiated expenses for which Herfurth demands payment, including a payment of $117,500 allegedly due to Waking Giants, some or all of which, on information and belief, are fraudulent, and which total $258,008. Indeed, on information and belief, misappropriating funds from one entity to another is part of Herfurth's standard operating procedure.

25.     Herfurth—one may logically infer that he was driven by financial desperation due to his recent insolvency—began to back away from his acceptance of the termination. He began to threaten Home Run with lawsuits and increased his demands for payment for invoices for Defendant, and for vendors and service providers with whom Home Run had no privity of contract (indeed, she was never shown any of the alleged

14

contracts between defendant and third parties), and—despite the "partnership" arrangement Defendant strove to create, Home Run was provided no written contracts with any vendors or service providers, or invited to participate in the negotiations with same.

26. Home Run's entertainment counsel sent Herfurth a letter on October 25, 2012, explaining that Hefurth's despicable threats and fraudulent demands were baseless. Herfurth responded by hiring a lawyer in Oklahoma who sent Mathews a letter dated November 6, 2012 threatening to file a lawsuit unless Home Run pays Defendant $778,008.

27. Defendant's desperate, fraudulent, and unfounded demands have compelled this lawsuit. Not only is defendant's demand for money outrageous and unsupported by the contract, the contract makes plain that, contrary to defendant's demand, payment was contingent on Home Run's ability to obtain full financing. (Ex. A at 9.)

**First Cause of Action**
(Declaratory judgment)

28. Home Run realleges all of the Verified Complaint's allegations.

29. Home Run is entitled to judgment declaring (a) the contract to have been terminated as of October 18, 2012 upon Herfurth's written acceptance of the oral notice of termination; (b) Defendant waived the cure period; (c) all of Home Run's obligations to Waking Giants ended on October 18; (d) Home Run has no financial obligations to vendors or service providers with whom Defendant contracted; (e) that Defendant owed Home Run a fiduciary duty; (f) that Defendant violated its fiduciary duties to Home Run

15

by seeking to coerce it into paying monies it does not owe, and, on information and belief, by funneling money designated for Home Run to other projects Defendant was covertly subsidizing by stealing from Home Run; (f) that Defendant breached its contract with Home Run by its numerous failures and acts of nonfeasance and incompetence; and (g) Defendant breached the covenant of good faith and fair dealing.

30.     Inasmuch as Defendant has threatened to try to harm the motion picture and thwart its progress, for which Home Run would have no adequate remedy at law, Home Run is entitled to injunctive relief prohibiting Defendant from (a) contacting or communicating with Home Run's investors; (b) prohibiting Defendant from using Home Run's name in connection with the promotion of Defendant's business; (c) prohibiting Defendant from endeavoring to enjoin the motion picture's production, release, or distribution; (d) requiring Defendant to disgorge the payments it received from Home Run for the services it failed to perform; and (e) such other relief as the Court deems just.

### Second Cause of Action
(Breach of fiduciary duty)

31.     Home Run realleges all of the Verified Complaints allegations.

32.     Defendant's contract and other documents with Home Run purport to create a "partnership" with Home Run. While there was no partnership entity formed between the parties, Defendant describes the relationship as a "partnership for distribution" and states that Defendant "shall be a partner with Home Run . . . ." (Ex. A. at 1.)

33.     Defendant held itself out as more than a service provider dealing at arm's length. Defendant described its approach and relationship with Home Run as one of

partnership in the sense of mutual trust and obligation, and thereby undertook a fiduciary duty to Home Run as also evinced by their bizarre organizational chart, which depicted a partnership with Home Run.

34.    Defendant breached its fiduciary duty to Home Run by seeking to coerce it into paying monies it does not owe; by failing to honor its contractual obligations; and by seeking to compel it to pay vendors and service providers with whom Home Run has no privity; and by submitting demands for payment that are, on information and belief, based on fraudulently inflated or totally fabricated invoices.

35.    Defendant, by way of example, incurred a $25,000 debt—which it put on Home Run's tab—for a useless appearance at a film conference at which Home Run was the sole sponsor without a booth. On information and belief, Lokkesmoe used the opportunity to dupe Home Run into subsidizing his appearance at a conference where he furthered his own agendas, which had nothing to do with Home Run.

36.    Additionally, Defendant fabricated charges and invoices for work that was never performed. and, on information and belief, after Home Run ended the contract, Defendant encouraged vendors to charge exorbitant, unsubstantiated fees.

### Third Cause of Action
(Breach of contract)

37.    Home Run realleges the Verified Complaint's allegations.

38.    Defendant breached its contract with Home Run by failing to provide the materials it had promised to provide both under the contract and in communications preceding and following the contract: by failing to staff critical meetings and

conferences; and by failing to provide every critical obligation it was obliged to fulfill under the agreement including, without limitation, making Home Run its priority.

### Fourth Cause of Action
(Fraud in the inducement)

39.     Home Run realleges the Verified Complaint's allegations.

40.     Defendant fraudulently induced Home Run to enter into a contract with it by fraudulently claiming substantial success, experience, and contacts in the motion picture industry, and that it had numerous existing relationships that it could "leverage" to accomplish the goals of publicizing and distributing the motion picture.

41.     These assertions were fraudulent and made with the intent to deceive Home Run, which justifiably relied on them to its detriment.

### Fifth Cause of Action
(Unjust Enrichment)

42.     Home Run realleges the Verified Complaint's allegations.

43.     Defendant received money for services it failed to provide. Defendant took the money and ran—away from its obligations under the contract.

44.     Defendant has therefore received payment for services it failed to provide.

### Sixth Cause of Action
(Breach of the covenant of good faith and fair dealing)

45.     Home Run realleges the Verified Complaint's allegations.

46.     Like every contract, Ex. A contains, implicitly, the covenant of good faith and fair dealing, which operates to prevent Defendant from depriving Home Run of the benefits it reasonably expected under Ex. A, regardless of whether such benefits were

18

expressly set forth in Ex. A.

47.    The covenant also makes it wrongful for Defendant to abuse the contractual relationship to further its interests at Home Run's expense, which Defendant did time and again.

48.    By engaging in the actions and omissions described above, Defendant breached the covenant of good faith and fair dealing.

**WHEREFORE**, Plaintiff requests judgment against Defendant as follows:

1.    On the First Cause of Action, judgment declaring (a) the contract to have been terminated as of October 18, 2012 upon Herfurth's written acceptance of the oral notice of termination; (b) Defendant waived the cure period; (c) all of Home Run's obligations to Waking Giants ended on October 18; (d) Home Run has no financial obligations to vendors or service providers with whom Defendant contracted; (e) that Defendant owed Home Run a fiduciary duty; (f) that Defendant violated its fiduciary duties to Home Run by seeking to coerce it into paying monies it does not owe; (g) injunctive relief prohibiting Defendant from contacting or communicating with Home Run's investors; (h) prohibiting Defendant from using Home Run's name in connection with the promotion of Defendant's business; and (i) prohibiting Defendant from endeavoring to enjoin the motion picture's production, release, or distribution.

2.    On the Second Cause of Action, damages in an amount to be determined at trial, but in no event less than $112,500.00;

3.    On the Third Cause of Action, damages in an amount to be determined at trial, but in no event less than $112,500.00;

4.     On the Fourth Cause of Action, damages in an amount to be determined at trial, but in no event less than $500,000, and an award for punitive damages in an amount to be determined at trial but in no event less than $500,000.00;

5.     On the Fifth Cause of Action, damages in an amount to be determined at trial, but in no event less than $112,500.00;

6.     On the Sixth Cause of Action, damages in an amount to be determined at trial, but in no event less than $300,000.00;

7.     Attorney's fees and costs; and

8.     Such additional relief as the Court deems just.

Dated:        New York, New York
              3 December 2012

Theodore L. Blumberg
*Counsel for Plaintiffs*
230 Park Avenue, 10th Floor
New York, New York 10169
(212) 808.7235
tblumberg@blumbergfirm.com

20

## Verification

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

Theodore L. Blumberg, an attorney admitted to practice before the courts of this State, affirms under CPLR 2106 that I am the plaintiffs' attorney in this case and the foregoing Complaint is true to my own knowledge except as to matters stated on information and belief. As to those matters I believe them to be true. The grounds of my belief about all matters not stated on my knowledge are correspondence and other writings provided by plaintiffs and interviews with officers and employees of plaintiffs. The reason this verification is not made by either plaintiff is that plaintiff Home Run The Movie, LLC is a foreign corporation whose officers live and work outside the State, City, and County of New York.

Affirmed this 3rd day of December 2012

Theodore L. Blumberg

21

EXHIBIT A



August 16, 2012

CONFIDENTIAL

Carol Mathews
Executive Producer
Homerun – The Movie
3701- A South Harvard Ave. #308
Tulsa, OK 74135

Carol:

Thank you for taking time with me yesterday to discuss our Proposal. Enclosed is an updated Proposal reflecting our conversations to date. Specifically, this Proposal eliminates the two phased approach and collapses all activities into a single set. Waking Giants shall be a partner with Homerun to discern the best distribution model and any potential providers to be utilized. Within the context of the partnership, expected Waking Giants shall have responsibility for:

1)  Theatrical release;
2)  Strategic Marketing plan;
3)  Execution of marketing activities;

In the partnership for distribution, it is expected the team members are Carol Matthews, Erik Lokkesmoe, Corby Pons, and Ken Herfurth. It is understood Homerun has an attorney, Elsa Ramo, who shall participate as needed and represent Homerun. The enclosed Proposal provides more details on activities to be accomplished by the team, fees and other related terms.

We hope our Proposal continues to be consistent with our communication and excitement to date. We are ready to begin work as soon as possible. We look forward to reviewing with you at your earliest convenience.

With our best regards,

Erik Lokkesmoe, Principal

Ken Herfurth, Principal

Corby Pons, Principal
**Waking Giants**



**OVERVIEW:**

Over the past few months, the principals of Waking Giants and the principals of Homerun have spent significant time together sharing strategies and motives, goals and outcomes for the success of the motion picture project and beyond. We believe there is a shared motivation and passion for the project, as well as an understanding that in an ever-changing marketplace a new approach is necessary to reach the shared goals. Waking Giants brings proven industry leadership and results, a smart and forward-thinking strategy for marketing and distribution, and a deep affinity and connection to the target audience. Waking Giants is pleased to present this Proposal for the distribution and marketing of Homerun.

Several motives drive this Proposal. For Homerun, the motive is to partner with like-minded individuals with the necessary skill sets and relationships to effectively market and distribute the film while working to maximize a return for the investors and maximize impact to the market. For Waking Giants, the motive is to partner with like-minded individuals with an excellent product being able to bring customized distribution and marketing services to maximize the benefit to the market, investors and the people Waking Giants is directly serving. The partnership is intended to be an 'all-in' approach where the team members work together to make the best decisions on behalf of Homerun. Given these motives, Waking Giants believes both parties are highly aligned and have the requisite foundation of relationship, strategic, business and execution expertise to meet Homerun's goals and aspirations.



**DEVELOPMENT PROCESS:**

Waking Giants will be focused on three core elements in the development process for Homerun. These are:

### Discovery and Collaboration

- A comprehensive, coordinated, and consistent campaign begins with a team that shares its purpose and passion. Early, regular, and on-going interactions will enable us to explore all facets of the movie, its existing opportunities and relationships, and the potential challenges and successes. The goal is for the team to have full insight, trust, and confidence in how to make great decision and how to deliver results together.

### Interpretation and Strategic Development

- Waking Giants will be leveraging all of its existing strategies, relationships, contacts, experience, and ideas to explore every possible "business model" for Homerun. The collection and interpretation of research and data, experience and ideas will create numerous plans — which will be further refined and presented to determine, in collaboration with Homerun, the best architecture and execution for the movie.

### Strategy and Execution Framework

- Next, an execution framework, timeline and budget will be provided in detail. The "gameplan" will be created to guide the overall distribution and marketing, while creating enough flexibility to notice and to exploit all new opportunities that will likely surface.

WAKING GIANTS

DISTRIBUTION AND MARKETING
PROPOSAL

**ENGAGEMENT:**

The relationship between Waking Giants and Homerun shall begin promptly upon consummation of this agreement.

**RESPONSIBILITIES:**

As partners with Homerun, *Waking Giants shall provide the following distribution and marketing services:*

1. Direct and active participation as part of the leadership team along with Carol Mathews to develop, design and execute distribution and marketing for Homerun.
2. A comprehensive budget supporting the distribution and marketing plan for the project.
3. A custom best in breed (as defined by the team) and complete domestic and foreign release of Homerun – including theatrical, home entertainment, VOD, digital, broadcast, foreign, and licensing – in a way that maximizes audience potential and advances "movement" behind movie.
4. Creation and execution of a comprehensive, coordinated and compelling marketing campaign.
5. Management and execution of a national audience acquisition, activation, and acceleration campaign that moves target audiences from awareness to action.
6. Plan, establish and execute a model to catch the audience to take action.

Waking Giants shall have direct responsibility to execute:
   - All marketing activities incorporated in the distribution plan
   - Any theatrical distribution plan.

Activities to be completed by the team include but are not limited to:

**Preparation, Executive and Handoff:**
   - Leadership roles, team identification and development
   - Facilitation exercises as necessary
   - Strategy and execution planning exercises and development
        o Identification of essential relationships and ownership
   - Budgeting of plans driving total required P&A funds
   - Project planning and management
   - Application for rating from MPAA
        o Assist in re-edit, if needed, based on marketing or rating feedback
   - Master Print Fees – VPF Fees, manufacturing (digital or print) and fulfillment
   - Expansion and scenario planning
   - Orchestrated handoff to long term 'movement' owner

**Funding:**

**WAKING GIANTS**

DISTRIBUTION AND MARKETING
PROPOSAL

- Assisting in the creation, development and review of materials to present to investors for the purpose of funding Homerun's distribution plans;
- Including review of current financial modeling, production financial agreements, waterfall analysis;
- Reviewing existing P&A investment structure, corresponding document review, and providing recommendations;.
- Participating directly in investor conversations and meetings.
- Assist in establishing extended funding model in case of broader theatrical release

**Reporting:**
- Budget management
  - o Associated bank accounts, accounting, invoice management, etc.
- Investor support and updates
- Producer's Reports

**Creative (Marketing and Advertising):**
- Early preparation for the distribution and marketing plans in order to maximize long-lead opportunities, partnerships, and publicity.
- Market research and identification of sub-markets, messaging to multiple markets
  - o Church and faith based plan
  - o Pre-sales through identified markets
- Creative/Messaging (key art, one-sheet, trailers, other collateral material)
- One-Sheet and Trailer placement.
- Website and messaging review, oversight and integration
  - o Managing Rollout/maturation/changes over time
- Alternative revenue streams (other products)
- Study Guides/Conversation Guides/Leader Guides
- Publicity (national, regional, and local, faith and general market)
- Partnerships (large, effective marketing partners – Young Life, Celebrate Recovery, Retail)
- Social (custom digital solutions)
- Web/Mobile (activation platforms)
- Grassroots Data Acquisition
- Field Reps (localized reps in key markets)
- Advertising (digital, broadcast, radio, podcast, print and other)
- Promotions
- Screening Programs
- Celebrate Recovery Assistance – Battling 1000

**Theatrical:**
- Theater Identification

WAKING GIANTS

- Booking, partnering, reporting, and collecting theatrical release (800+ screens targeted)
- Exhibitor relations and trade liaison
- Foreign Release Exploration and Delivery

**DVD, VOD, Streaming, Digital:**
- DVD, VOD, and Digital plans including any build, negotiations and delivery
- DVD, VOD, Streaming and Digital final version and print
- Ancillary DVD material selection, oversight and orchestration, integrated previews (product placement)

**Broadcast and Syndication:**
- Broadcast and syndication plans including any build, negotiations and delivery

**Retail:**
- Retail model, partnerships, bundling, rollout and management
- Placement, negotiations, scheduling, and delivery

**Group:**
- Group model and partnerships
- Group licensing.

*Working primarily through Carol Mathews, Homerun shall be responsible for the following:*

- Create and outline specific activities requiring Waking Giants marketing support services;
- Provide scheduled updated information and feedback as needed and determined by Waking Giants and Homerun;
- Own any and all relationships with investors and provide primary investor support services;
- Provide all investor relationships and opportunities for the project. Active participation as needed as a part of oversight team for project
- Ownership of identified essential relationships
- Investor relations
- As needed approvals
- Any required legal and contractual documents
    o Clean chain of title for film
    o Union sign-offs
    o Legal opinions, if needed
- Financial model and waterfall
- Revenue bank accounts
- Distributions and accounting management

**WAKING GIANTS**

- Related tax documents, if needed

An example of the Scope of Work (SOW) shall include:
- Planning, Design, and Counsel
  - o In-person and on-phone meetings between HOME RUN and WAKING GIANTS to build "game plan" for distribution and marketing.
  - o Creation of first draft of game plan.
  - o Activation of execution team (publicity, church outreach, digital, creative, etc.).
  - o Providing on-going counsel for decision-making.
  - o Official kick-off starting with an offsite orchestrated around (before or after) closing of funding for distribution.
- Long-lead Marketing & Publicity
  - o Activating publicity for release date, profile interviews and features, and early work on EPK, if not already existing.
  - o Early oversight, development/re-designing of HOME RUN website.
  - o Launch/re-design social platforms.
  - o Prepare call-to-action collateral/platforms for Summit response, such as DemandTheMovie.com.
  - o Audit of all creative, begin edits.
  - o Create positioning narrative and final synopsis, message points and log line.
- Distribution Planning
  - o Review of all potential release dates, tentative selection of release date.
  - o Overview of comps, creating of target 800 theaters.
- Financial
  - o Audit and alignment of financial modeling, structure and investor documents for initial raise and distribution funding.
  - o Creation of pitch deck and requisite materials for investor meetings.
  - o Attending meetings and pitches with investors.
  - o Identify closing cycle and activities to close funding on time.
  - o Aiding in the vetting, review, structure, and closing of additional investors.

We currently expect the deliverables during the first 60 days of this engagement to include:
- Capital raised for distribution plan by end of September with direct participation of HOME RUN and Waking Giants.
- First Draft of HOME RUN Game Plan which may include other third party providers.



DISTRIBUTION AND MARKETING
PROPOSAL

- Activation of core team.
- Publicity support for long-lead press and announcements.
- Early development of social and web platforms.
- Polish on messaging, creative, and collateral.

| Outstanding Invoices | Date | Invoice # | Amount | Notes |
|---|---|---|---|---|
| Lithotone | 10/18/12 | 36082 | $7,450.00 | Materials |
| Lithotone | 10/18/12 | 36083 | $2,440.00 | Materials |
| City Room Creative | 9/27/12 | 6082 | $500.00 | Trailer - Credit Revisions |
| Dupree Sports Equipment Co | 9/27/12 | 43853 | $1,040.00 | per Micah |
| J. Oxford Studios, Inc. | 9/24/12 | 1376 | $8,250.00 | sizzle reel |
| Purepublicity | 10/4/12 | 10042012 | $5,000.00 | publicist - long lead, press release, etc |
| Cistern Media | 9/30/12 | 201800 | $13,153.05 | Design refresh, key art, polish, poster, collateral |
| Catalyst Sponsorship | 10/15/12 | 55100011880 | $15,000.00 | see payment schedule and agreement for Catalyst |
| J. Oxford Studios, Inc. | 10/18/12 | 1382 | $2,085.00 | sizzle reel |
| Art Affects | 10/18/12 | | $92,500.00 | theatrical distribution - see email note from Art Affects |
| Cistern Media | 10/18/12 | 201812 | $11,222.58 | Design refresh, key art, polish, poster, collateral |
| Waking Giants Media | 10/18/12 | | $117,500.00 | per agreement |
| Waking Giants Media (expenses) | 10/18/12 | | $9,871.12 | expenses |
| Grace Freeman | 10/18/12 | 101 | $612.00 | social media |
| Leasing and Loving It | 10/18/12 | | $2,884.35 | screening and sponsorship |
| TopLine Strategies | 10/18/12 | | $7,500.00 | Customizing CRM |
| Totals | | | $258,008.20 | |

- Upon final payment to Waking Giants for the above and final documentation between Waking Giants and Home Run, Waking Giants is prepared to transition all assets and responsibilities asap.

3. For transitioning, Waking Giants shall assist Home Run by providing all assets and related information for work completed and in process. Waking Giants has shown good faith by already transitioning Basecamp to Home Run. Waking Giants will need to inform its relationships of the transition, and therefore will be contacting those that have engaged in conversations during the outreach phase about the changes. In addition, Waking Giants shall be available to assist with questions related to Waking Giants' responsibilities through Nov 17, 2012. Home Run shall provide information needed for an effective transition (related to transition certain activities, contractual relationships, working relationships and subscriptions). Waking Giants is prepared to make this transition happen as soon as reasonably possible.

4. Waking Giants believes that consistent messaging to the market benefits both parties. We desire no harm to come to Home Run (or Waking Giants). As such, it is recommended both parties agree upon language to provide to any outside party about the relationship and corresponding separation. As a starting point, here is language Waking Giants suggests:
   - The producer and Waking Giants have very different visions and strategies for how to distribute and market the movie. As such, both parties agreed to go their separate ways at this time.
   - Additionally, it is expected that any final documentation shall include appropriate non-disparagement clauses to protect both parties.

5. Relative to any ongoing relationship between the parties, Home Run may be interested in utilizing Waking Giants CRM system that has been customized for Home Run. If Home Run is interested, Waking Giants may be willing to submit a proposal for licensing the platform for use.

I believe this covers all areas to be addressed. You had mentioned you would have your legal counsel write up any final documentation. As soon as this is received, I can have our counsel review. Upon consummation of the agreement and final payment, we can effectively complete any outstanding transition and work.

Thanks

Ken Herfurth

Partner

**WAKING GIANTS ENTERTAINMENT GROUP**
New York. Scottsdale. Los Angeles.
e: Ken.Herfurth@wakinggiants.co
p: 480-227-9161
www.wakinggiants.co

**WAKING GIANTS**

DISTRIBUTION AND MARKETING
PROPOSAL

## PROJECT FEES

Given the conversations to date, Homerun and Waking Giants desire to begin immediately.

The fixed price for Waking Giants' services for this Proposal is $750,000. This price includes Waking Giants participation in all activities outlined in this proposal including marketing, theatrical, retail, VOD and other distribution methods outlined.

Payment terms are: $37,500 upon signing this Proposal, and $75,000 per month paid on the 10th of each month. One last payment of $37,500 shall be made on June 10th, 2013. Waking Giants shall submit an invoice by the 1st of each month for billing.

Travel and entertainment expenses shall be pre-approved by Homerun and reimbursed on monthly increments with appropriate expense reporting.

Professional fees required to complete any of the above activities listed (legal, accounting, and others) are not included in Waking Giant's services.

A summary of fees is provided below.

## PROJECT FEE RECAP - Subject to all applicable taxes

| Total Services | One-Time Fee |
|---|---|
| Upon Signing | $37,500 |
| By September 10th, 2012 (monthly thereafter) | $75,000 |
| Last Payment scheduled for June 10th, 2013 | $37,500 |
| TOTAL | $750,000 |

## PROJECT TERMS

The term of this agreement is expected to be 10 months subject to realization of investment for P&A funding for the project.

Waking Giants shall disclose to Home Run any transactions or potential transactions involving vendors closely held, owned or affiliates of Waking Giants.

Waking Giants shall receive a credit as the distribution company for the film in North America with other credits (international or other) dependent upon actual implementation.

In the event that either party believes that the other materially has breached any obligations under this Proposal or for non-performance, such party shall notify the breaching party in writing. The breaching party shall have fifteen (15) days from the



receipt of notice to cure the alleged breach or non-performance. Both parties agree to work in good faith to assist each other to remedy any breach or non-performance. If the breach or non-performance is not cured within fifteen (15) days, the non-breaching party shall have the right to terminate the Proposal without further notice.



DISTRIBUTION AND MARKETING
PROPOSAL

| CLIENT INFORMATION | WAKING GIANTS PROJECT CONTACTS |
|---|---|
| Client Contact: Carol Mathews<br>Project: Homerun the Movie, LLC<br>Tasks: Distribution and Marketing Services | Strategic Lead:  Erik Lokkesmoe<br>Support:   Corby Pons, Ken Herfurth |

## AGREEMENT & EXECUTION

By executing the following, both parties agree to proposed terms outlined.  Upon signing this agreement, both parties expect to begin immediately.  Concurrently, both parties will work with representation to formalize a contract reflective of the terms and conditions aligned with such a Proposal.  The parties hereto each acting with proper authority have executed this Proposal.

*Homerun the Movie, LLC*                    *Waking Giants, LLC*

_____                    _____
Full Name                                   Full Name


_____                    _____
Signature                                   Signature


_____                    _____
Date                                        Date

FILED: NEW YORK COUNTY CLERK 12/17/2012
NYSCEF DOC. NO. 4

INDEX NO. 654220/2012
RECEIVED NYSCEF: 12/17/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------X

HOME RUN THE MOVIE, LLC

          Plaintiff,

    -against-

                                   Index No.    654220/12

WAKING  GIANTS  MEDIA  GROUP,
LLC dba WAKING GIANTS, LLC,

          Defendant.

-----------------------------------------------------------X

## FIRST AMENDED VERIFIED COMPLAINT

Through its counsel Theodore L. Blumberg, Plaintiff states under penalty of perjury that:

### I.    Introduction

1.    Waking Giants's deceit, incompetence, and chronic failure to fulfill contractual obligations large and small, are the story of this case, which illustrates, among other things, defendants' bad faith, bungling, and audacity.

2.    Boiled down to its essence, defendant breached its contractual obligations to plaintiff Home Run. When Home Run member and executive producer Carol Spann Mathews availed herself, on Home Run's behalf, of the cancellation clause in the contract (which defendant drafted) defendant, through member Kenneth C. Herfurth, accepted the cancellation, waived the cure period, and ended the agreement.



EXHIBIT
2

3.      Herfurth, on information and belief a founding member of defendant, was desperate to replenish his coffers after his personal bankruptcy in March of this year. (That bankruptcy came on the heels of a multimillion dollar judgment against Herfurth arising from an action for, among other things, breach of contract and breach of the covenant of good faith and fair dealing,[1] which appear to be a pattern of Herfurth's.) He tried to rescind Waking Giants's acceptance of the cancellation and is now, absurdly, demanding payment for the full contractual period, as well as payments to vendors and service providers, some or all of which, on information and belief, are fraudulently inflated or entirely fabricated.

II.      **The Parties**

4.      Plaintiff Home Run Movie, LLC is an Oklahoma limited liability with its principal place of business located at 3939 South Harvard Avenue, Tulsa, OK 74135.

5.      Waking Giants Media Group, LLC, is allegedly a limited liability company[2] Kenneth C. Herfurth, Erik Lokkesmoe, and Corby Pons formed in 2012. Waking Giant's principal place of business is located at 247 W. 30th St., 4th Floor

---

[1] *Brown's Custom Fence Co., Inc. v. BCF Acquisition, LLC, Kenneth & Jodi Herfurth, et al.*, No. CV 2010-015209 (Sup. Ct. AZ, Maricopa Cty., filed 5/18/10).

[2] A nationwide search of databases failed to locate any information about the state in which Waking Giants formed its LLC. The Waking Giants website boasts that the company has a presence in New York, California, and Arizona but the company is apparently not registered in any of those states, nor did a search of the Delaware database turn up information. If it turns out that Waking Giants is an LLC in name only, plaintiff reserves its right to amend the Verified Complaint to proceed directly against Herfurth, Pons and Lokkesmoe individually, and to add additional causes of action for fraud.

New York, NY 10001.[3]  Also on information and belief, Herfurth is a resident of Arizona,

Lokkesmoe is a resident of New York, and Pons is a resident of California.

## III.  The Facts

6.    Home Run was formed to produce a motion picture entitled "Home Run."

That picture is currently thriving and on schedule in the phase of creation known as

marketing and distribution.

7.    At all times relevant to this action Waking Giants held itself out as a

company expert in publicizing and distributing motion pictures.[4]

8.    Waking Giants's assertions of expertise and experience are fraudulent and

were made with the intent to deceive Home Run. On information and belief, Waking

Giants, which was likely formed in 2012, has no track record in the motion picture

industry.[5] A leading entertainment industry website, imdbpro.com, as of the date of this

pleading, has no listing whatsoever for Waking Giants—no credits, no motion pictures in

production or motion pictures that have been produced.

---

[3] See http://wakinggiants.co/#!contact.html (last visited 11/27/'12).

[4] Without a distribution deal, a motion picture is like the proverbial tree that falls in the woods
with no one to hear it. Major distributors "exert tremendous power and influence over what films
are made, not just by providing financing, but also by providing access to the domestic theatrical
marketplace in a manner no other organizations can match." Bill Daniels, David Leedy & Steven
D. Sills, *Movie Money* 5 (2d ed. 2006).

[5] Mathews knew that Waking Giants was a new company; however, Herfurth, Lokkesmoe, and
Pons fraudulently misrepresented the extent of their experience and the depth of their
relationships in the motion picture industry to induce her to hire them, in reliance on their
fraudulent assertions. And they succeeded in deceiving her. Furthermore, they apparently
intended to use Home Run to train themselves—at Home Run's expense.

9.    On information and belief, Waking Giants' members, Herfurth, Lokkesmoe, and Herfurth have no meaningful experience distributing motion pictures, nor do they have meaningful credits as motion picture publicists. Pons's sole credit on imdbpro.com is a "special thank you" in connection with a motion picture.[6] Lokkesmoe's occupation is listed as "actor" and his sole listed credit is for a short film entitled "Behind the Praise Band."[7] a short film, and Herfurth has two "executive producer" credits,[8] discussed below.

10.    Defendant Herfurth, on information and belief, has a string of failed businesses to his credit, and, as noted, his bankruptcy petition was granted this year under Chapter 7 of the Bankruptcy Code.[9]

---

[6] http://pro.imdb.com/name/nm3412700/ (last visited 12/3/12). Imbdpro.com is subscription-based website that requires a monthly fee. The stripped-down version available to the public free of charge iterates the above information for Pons. http://www.imdb.com/name/nm3412700/?ref_=fn_al_nm_1 (last visited 12/3/12).

[7]    http://pro.imdb.com/name/nm1698936/   (last   visited   12/3/12).   See   also http://www.imdb.com/name/nm1698936/?ref_=fn_al_nm_1 (last visited 12/3/12).

[8] Although "executive producer" sounds higher and mightier than the unadorned "producer," in motion picture industry argot "producer" is by far the more meaningful title, and indicates a direct hands-on relationship to the project. *See* Christine Vachon, *A Killer Life* 8 (2006)("[I]n film, the credit 'executive producer' can be a symbolic gesture, a title doled out as a favor . . . ."). The title "executive producer" title is notoriously broad and can connote a person experienced in the motion picture industry who helped obtain financing, to a "local real estate magnate . . . a 'sugar daddy' . . . or merely Mom and Dad." Dov Simens, *From Reel to Deal* 29 (2006). Notably, to qualify as a producer with the Academy of Motion Picture Arts and Sciences, "you've got to have at least two sole producer screen credits—not executive producer, not co-producer . . . Just producer." *A Killer Life* at 8.

[9] United States Bankruptcy Court, Dist. Of Arizona (Phoenix), Petition 2:11-bk-21791-RTB. The filing was submitted on 7/28/11 and Herfurth and his wife received a discharge on 3/6/12.

4

**Waking Giants's Business Guru: the Newly Bankrupt Herfurth**

11.     Pons and Lokkesmoe touted Herfurth to Mathews as the business expert behind Waking Giants, describing him as having a brilliant mind for business. In fact, Herfurth lacks relevant experience and success in publicizing and distributing motion pictures. On information and belief, his experience in the motion picture industry is limited to an executive producer credit for a picture called "Seven Days in Utopia"[10] from which Herfurth, by his own account, was fired. And Herfurth's recent bankruptcy does little to instill confidence in his business acumen.

**Home Run meets "Waking Giants"**

12.     Home Run's executive producer Carol Spann Mathews met Lokkesmoe and Pons through a consultant to Home Run. The consultant advised Mathews that Lokkesmoe and Pons might be good candidates for publicizing the picture. At the time, the consultant was familiar with Lokkesmoe and Pons because of Lokkesmoe and Pons's involvement with a publicity firm called "Different Drummer."[11]

13.     Led by Herfurth, the three Waking Giants members fraudulently induced Home Run to enter into a contract with Waking Giants. (A copy of the contract is attached and incorporated herein by reference as Exhibit A.) The crux of the fraudulent

---

[10] http://pro.imdb.com/name/nm4002552/ (last visited 11/27/'12).

[11] Different Drummer has one film to its credit, on which it provided publicity. http://pro.imdb.com/company/co0252346/maindetails (last visited 11/28). The film is listed as a documentary titled "Call and Response." The link to the Different Drummer website (www.differentdrummer.com takes one to a spare page titled, "Demand, the Movie" and features a fill-in box requiring the viewer to provide name, address, etc., below the question, "Want to get in on the action?" http://www.differentdrummer.com/ (last visited 11/28/'12.)

inducement can be found in, among other items, fraudulent assertions that Waking Giants:

      a)    is able to "bring customized distribution and marketing services" (Ex. A at 2), to the motion picture when, in fact, Waking Giants has no suitable industry contacts or affiliations;

      b)    "brings proven industry leadership and results" (id.) to the motion picture when in fact it has no track record of the relevant kind in the industry, let alone "proven . . . leadership;"

      c)    "will be leveraging all of its existing . . . relationships [and] contacts" (Ex. A at 3) for the motion picture's benefit. As noted, Waking Giants was and is an industry tyro run by a newly bankrupt and chronically unsuccessful businessman, and two other members with apparently no experience distributing motion pictures; and

      d)    Defendant asserted that Home Run would be its priority project during the contractual period, that they had passed on other projects to take on Home Run, would not be juggling other projects, and would thereby provide Home Run copious attention.

    14.    Defendant also bound itself to a series of promises and obligations under the contract, and in assertions leading up to the contract, and repeatedly failed to meet them. By way of example but not limitation, the contract states, "As partners with Home Run, *Waking Giants shall provide the following distribution and marketing services:*" (Ex. A at 4)(emphasis in original).

a)      "Direct and active participation as part of the leadership team . . . to develop, design and execute distribution and marketing for Home Run." (Id.) Defendant's members continually missed critical meetings, were frequently absent or unavailable to participate in the "leadership team," and defendant failed to develop, design, or execute distribution and marketing for Home Run. Indeed, the marketing plan defendant formulated comprised nearly no new ideas or strategies (and was largely no different from Mathews's marketing plan, developed for investors nearly two years earlier). This rehashing was in contrast to a key element of their sales pitch to Mathews, when they fraudulently asserted that their stock in trade was innovative approaches.

b)      Defendant was to prepare "A comprehensive budget supporting the distribution and marketing plan for the project." (Id.) Defendant provided only an Excel spreadsheet with generalities, and never meaningfully met this obligation.

c)      Defendant was to create and execute "a comprehensive, coordinated and compelling marketing campaign." Defendant promised to provide a number of different strategies. (Id.) Defendant never met this obligation—in the sixty days the parties worked together, defendant never provided any of the promised strategies.

d)      Defendant was to manage and execute a "national audience acquisition, activation, and acceleration campaign" (Ex. A at 4). Defendant never met this obligation.

15.      Defendant's fee was $750,000. (Ex. A at 9.) Home Run was required to pay, and paid, $37,500 when the contract was signed on August 17, 2012. And Home Run was required to pay, and paid, $75,000 per month thereafter, until October 17, 2012

7

when Home Run canceled the contract, as discussed below. Had the contract remained in effect, Home Run's final payment would have been due June 10, 2013.

**Defendant Ignored Home Run's Queries and Complaints**

16.   Frustrated by Defendant's failure to live up to its obligations, and hoping to provide a tangible basis from which to correct those failures, on September 2, 2012, Mathews sent Defendant a detailed email stating, in relevant part:

> . . . I wanted to give you all some initial feedback in writing so you all could collect your thoughts/responses between now and when we chat on the phone. It will help our call move more quickly if you have some initial thoughts from us since we have so many . . . First. The book was very pretty. It also probably provides us with a *necessary* template to begin conversations that will no doubt dive deeper. And, of course, I know that we were going to be shading in the details as the year goes on so there was no way for you to do that over a two week period. Yet, as pretty as it was, this felt more like a pitch that we might have received by you guys at the Amarano [a local restaurant] than a custom marketing campaign; honestly, there is a little disappointment in that we thought there would be actual strategy, some ideas we hadn't thought of, maybe something "different" and a little less boiler plate stuff.
>
> Some overarching things I would have liked to see was this:
>
> 1) What are the goals? What does success look like? 750,000 opening weekend or opening night? What about the rest of the theatrical phase?[12]
>
> 2) What are the benchmarks along the way? Where will we assess if we are on track to our 750,000 whatever and what are the target numbers for those benchmarks? B1000s---how many by when? When will we determine how many theaters? What will be our factors for determine theaters? Just b1000s? What else? What are the social media goals that are MEASURABLE? how do you measure them? What does success look there and when do you think we will get to certain places in the social media landscape that will tell us we are on the right---or wrong---track? Biggest issue for Tom and me: there is no way for us to manage if we cannot see the targets and how we well we are moving toward them![13]
>
> 3) How and who will assess when an opportunity is on track with where we are going? What are you all going to do to avoid the "spray and pray" technique you hate so much? What makes a partner a good partner--? Or an interview possibility? Or a media outlet? What makes a relationship a great one? This all needs to be defined so we can work in lockstep and not waste time or money.[14]

---

[12] Defendant never answered this question.

[13] Defendant never responded.

[14] Defendant never responded.

4) There has been a lot of discussion about data capture and shifting and moving our plans based on what we are learning as we chat over Diet Coke at the Amarano and eggs and bacon at Bob's. But no mention of it in the proposal.[15]

5) *There is a lot of same ol' stuff in this proposal as in others which I am certain is necessary order of movie marketing business. But it'd be awesome if we knew the 'why' behind them from your perspective. Again--helps us work with you as a team if we understand your thinking and it avoids us pushing ideas to each other that will simply not work . . .*[16]

Theatrical: And you talk about one-sheets and trailer placement but what about the important issues around advance ticket sales at the theater (which is a huge deal)? We can't have people get 1000 ticket commitments and then give them 6 days to get their tickets to 1000 people.

Event Licensing: I love the idea of a fresh approach!! Would like to know the problem with the old approach that you are solving and how you will evaluate the risk vs reward of trying something new. How does this improve things and how will the pastor experience it? In other words--what are the advantages of the new approach.

Home Entertainment: Goals? Target partners? What does a good relationship deliver for us so we know it when we see it? Estimated revenue?[17]

VOD: Revenue projection, but the one you mention has no articulated basis--? *Where did you come up with $2mil on a $10 mil box office? What is your target partner here and why?*

Foreign: Great--a mention of a partner. But of course, we will be evaluating more than these. Again--what does a good partner deliver so we know when we find them? Estimated revenue goals?[18]

TV: No mention?[19]

PAGE 11[20] - . . . I thought you all wanted to avoid certain trades b/c we wouldn't do well there. Yet they are mentioned here . . . Are there stats on which you base your enthusiasm?[21]

---

[15] Defendant never responded to Mathews's mention of plans for collecting and owning data.

[16] Despite paying lip service to the "team" concept Defendant never provided Home Run the materials what would have allowed it to work in tandem with Defendant.

[17] Defendant never answered these questions.

[18] Defendant never responded, and similarly neglected its promise to prepare a pitch aimed at prints and advertising distributors. with targets for every revenue stream.

[19] Defendant---a would be distributor---never responded to the question about television, a potentially vastly significant revenue stream for the picture.

[20] Page numbers in the email refer to a document Defendant provided to Plaintiff which was supposedly a detailed marketing and distribution plan.

[21] Defendant did an about-face, advocating positions it had ruled out in meetings.

PAGE 12 - Publicity timeline - again. *This all looks good but the whys and the goals are not here so it just looks like a random to-do list.* I'm sure you have reasons but if you would articulate them it would help us operate more as a team. When is a publicity opportunity too early or not a good fit? When do we find out we need to do more b/c our results (which are what?) are not manifesting as we hoped?

PAGE 14 -  What are we going to do and when will we focus on motivating and mobilizing this huge ground force???[22]  This needs a focused plan with good ideas.

PAGE 15 - Church Engagement - other than the obvious stalls that come with a transition, what are we going to do here to increase our church engagement successes? what are our weaknesses and how are we going to fix them? How are we qualifying churches that are outside the CR community? What are you bringing to this effort by way of church relationships? (pastors wives thing? what does success look like there?) [23]How many churches are we going to 'touch' through our efforts. How many churches should be engaged on some level between now and Jan? Jan through Apr? . . .

PAGE 17 - MICRO SCREENINGS - there is so much more that needs to be discussed here. Why 50 micros? Why not 40 or 60? What makes it a good decision? Would micro screenings open possibilities for blessing our strategic partners? Also the leader screenings. Define "representative" at every screening. Do we worry that the RSVP / ticket response is asking for people to bring their family? friends?[24]  I do.

PAGE 18 - ADVERTISING - this is very parochial. Need to understand what and why. I.e.: Why KLOVE? Salem?  I get [sic] you have answers.  I just want them.  What are the 'active moviegoing sites?'

PAGE 22 - DEMAND THE MOVIE[25] - Very concerned that we are undermining the existing b1000 effort. True--it is very high shelf, to use your words, it is also 'out there' and we have to manage it--the good and the bad. Our concern is that, if we offer DTM and a 500 trigger, then the folks that have put themselves on the line for the b1000 campaign feel hoodwinked . . .

PAGE 24 - MARKETING COLLATERAL - For the record, I'm still lacking the reason for wanting to change things. It's important. If I understand the actual reasons to change the poster, it'd help me for now and ever more. Different is not always better. I can wait on the poster and just see it when I see it--but that is not a cost productive way to run most of the upcoming decisions. Which brings me to the trailer. *There are very specific reasons the trailer is what it is--if we change the trailer, I need to know what and why BEFORE we go to the great expense of actually doing it . . .*

PAGE 25 - *LEADERSHIP STRUCTURE is lacking any meaning on every level.* It looks like we are

---

[22] Defendant never answered this question.

[23] Horfurth fraudulently claimed he had vast experience with Church Engagement. When asked for detail, he claimed he had done "research." And proceeded to try to pick Home Run's contractor's brain for information about this potentially important market for the picture.

[24] Defendant never answered this question.

[25] "Demand the Movie" is a product that Defendant wanted to develop at Plaintiff's expense— literally, with Plaintiff subsidizing the product's development.

separate and detached except at the CR church engagement piece. Everything is ultimately my responsibility and should be reflected in the chart or why have it. Everyone else should have an area. WG cannot have three heads. Responsibilities have to be delineated and indicated in the org chart or why have it? . . . *There is no indication of who's handling money management. Who is managing data collected and assessing?  This page causes me concern as I think you all are in denial about the reality of our relationship--and or, possibly, how, to structure a real org chart imperative to manage any project of this girth.* It's probably the former.  Again.  We need to have a call or face to face meeting that addresses just this. An honest and real org chart will help  our ongoing long  distance  communication  in  every  way  imaginable.  It  will  lessen distractions, heighten productivity and nurture the team morale. A true, working org chart invites the right people to the right meetings and insures people know who to go to for questions. Too much going on to have a three-headed monster copied and weighing in on all things.  I know you guys know all of this---but we need to change this document . . . .

(Email from Carol Spann-Mathews to Defendant, dated 9/2/12)(emphasis added).

17.     Instead  of  providing  a  substantive  written  response,  two  days  later Lokkesmoe and Herfurth derided and scolded their client, Mathews. during a telephone call. Indeed. Herfurth had the audacity to scold Mathews for putting her concerns in writing! Defendant was given ample opportunities to cure its failures and breaches and never availed itself of them.

18.     Defendant's nonfeasance and careless disregard of its obligations continued. and worsened. Defendant, for example, made much of the fact that it would afford Home Run a presence at a critically important event run by an organization called Catalyst. Defendant used Home Run's money to attend the event to further projects that had nothing to do with Home Run—in violation of its contractual obligations and fiduciary duties. Mathews sent Defendant an email about the debacle:

[Y]ou never really embraced what I wanted which was a **legitimate** presence at the largest Catalyst event of the year. I asked a dozen times what our presence was going to be and got fast answers and loose references . . . I trusted your judgment that we didn't all need to be there, en masse, with a booth, and etc. And yes--the twitter thing was a very a good idea-- but didn't do well b/c it wasn't pushed from a booth---or a podium.  So it was a miss, too.

Here's the note I received from a state rep at Catalyst.  In nearly 3 years of working with CR---I have never had an email like this. It is bad for ALL of us if this type of report makes it back to John Baker.

Good Morning Carol, I am disappointed with the lack of presentation of Home Run at Catalyst. Yes there was the ad in the event book and the card in the bags, but what lacked was an introduction to the film before they showed the trailer. They showed it after about 4000 had already left for the day and that pile of 20 plus shirts sat untouched the entire time. It may of been all that was allowed I don't know. According to the list of sponsors, home run was one, but the only one there without a booth. But, at least we got what we did. Just my opinion. I guess I was expecting more! I am glad God is in charge of this.....we did hear questions about it and we answered the ones were heard. Praying for a great One Day in Maine and please give Mamie a hug for me. Thanks Debbie

I gathered by the lack of your own communications (twitter, or otherwise)...and then was confirmed by the above note, that we didn't have much show at all there. And, how was it that there was a pile of shirts *anywhere* and it be seen by *anyone*? It's not the shirts that matters, of course; it's the reflection of the attention given to the event by our man/men on the ground.

If you knew it was going to be exactly what it was, I wish you would have told me sooner, instead. I've shared with others that we were there---I encouraged your (now I realize---B.S.) tweet about Catalyst---and Home Run at Catalyst really wasn't anything and now I'm embarrassed for those from CR who were there and saw our weak presence for themselves. The last thing we can do is lose the confidence of this important core---and it starts with the state reps who emailed me!  It also does NOTHING for Waking Giants' credibility---people have their eyes on you b/c you got "Home Run"---the stupid tweets about the nothing at Catalyst was a bad idea. The 2 photos on Home Run FB? Also bad. It's smoke and mirrors and your competition is going to call you on it. And so will John Baker.

I feel this lack of showing at this huge event of our absolutely target-middle audience was a miss. John Baker asked me about it TODAY---he knows it was important. (thank God I hadn't seen Debbie's email)  **What should I say to him as to how we are going to connect with this crowd between now and April 19?[26]**

Please let me know what we spent for the East show---including your travel---and give me a bullet list of what you think might have been accomplished.[27] Also compare that to what it cost for other "sponsors."

And while I understand that you think it will be so great to be at Catalyst WEST, I'm need to understand why you think we would spend *that* money at *that* time.[28]  It happens the same week as Opening Weekend.

Please let me know what shows we are planning on attending---what are presence will be specifically---what we are spending---and what the thinking is (the why / the who / the measurable outcome).  A calendar would be nice. Perhaps you have already populated the calendar on base camp? (BTW---I texted you an hour ago---there is no access to BaseCamp...says account needs updating.)  Please let me know when the conference calendar and associated plans and budget can be expected.

---

[26] Defendant never answered this question.

[27] Defendant never responded.

[28] Defendant never responded.

We need to do better. I'm sure you agree.
Carol

(Email from Carol Spann Mathews to Defendant dated 10/6/12)(emphasis in original).

### Herfurth's tantrum and personal attacks on Mathews

19.     Defendant continued to disappoint Home Run. Important meetings and telephone conferences that Defendant was supposed to attend through one its members were forgotten or ignored. Fundraising efforts were more apparent than real. Materials and strategies that were supposed to have been provided were withheld, or so amateurish they required complete overhauls. Faced with Defendant's failure to cure its continued breaches, negligence, and incompetence, Home Run invoked the contract's cancellation clause on October 17, 2012. On that date Carol Mathews spoke with Herfurth and Erik Lokkessmoe, explained Home Run's disappointment with Defendant's breaches, and Herfurth accepted her cancellation, even though it was oral rather than written. Herfurth, however, began yelling at Mathews. He demeaned her personally and professionally, screaming that she had been "a bad partner" and he demeaned the motion picture, and stated that Waking Giants did not wish to continue working with Home Run. Mathews was stunned by Herfurth's personal attacks and gross lack of professionalism.

20.     The upshot and aftermath of the tirade, however, is that Herfurth did waive the contract's cure period. His acceptance of Mathew's oral cancellation and waiver of the cure period is confirmed by his email to her the following day. The email states, in pertinent part, "Waking Giants acknowledges that you/Home Run provided notice of Waking Giants' termination yesterday Oct. 17, 2012." (Email from Kenneth Herfurth to

13

Carol Spann Mathews dated 10/18/'12.) Herfurth goes on to state, "Although our agreement contemplates written notices, we accept the verbal notice provided yesterday." (Id. ¶1.)

21.     Herfurth failed to invoke the contract's 15 day cure period.

22.     Herfurth correctly next asserted, inaccurately, that "Our agreement with Home Run does not have a specific termination clause in place but does provide an outline and process for a 30 day termination period." (Id.)

23.     Contrary to Herfurth's statement, the contract contains a specific termination clause. Also contrary to Herfurth's statement, it does not contain "an outline and process" for a 30 day termination period. To the contrary, the contract contains the aforementioned 15 day cure period that Herfurth waived, and which provides that the failure to cure within the 15 days gives the "non-breaching party . . . the right to terminate the Proposal without further notice." (Ex. A at 10.) As noted, Herfurth waived the cure period and tried to dupe Mathews into accepting a "30 day termination period" he concocted of whole cloth.

24.     Herfurth's email lists mostly unsubstantiated expenses for which Herfurth demands payment, including a payment of $117,500 allegedly due to Waking Giants, some or all of which, on information and belief, are fraudulent, and which total $258,008. Indeed, on information and belief, misappropriating funds from one entity to another is part of Herfurth's standard operating procedure.

25.     Herfurth—one may logically infer that he was driven by financial desperation due to his recent insolvency—began to back away from his acceptance of the

14

termination. He began to threaten Home Run with lawsuits and increased his demands for payment for invoices for Defendant, and for vendors and service providers with whom Home Run had no privity of contract (indeed, she was never shown any of the alleged contracts between defendant and third parties); and—despite the "partnership" arrangement Defendant strove to create, Home Run was provided no written contracts with any vendors or service providers, or invited to participate in the negotiations with same.

26.    Home Run's entertainment counsel sent Herfurth a letter on October 25, 2012, explaining that Hefurth's despicable threats and fraudulent demands were baseless. Herfurth responded by hiring a lawyer in Oklahoma who sent Mathews a letter dated November 6, 2012 threatening to file a lawsuit unless Home Run pays Defendant $778,008.

27.    Defendant's desperate, fraudulent, and unfounded demands have compelled this lawsuit. Not only is defendant's demand for money outrageous and unsupported by the contract, the contract makes plain that, contrary to defendant's demand, payment was contingent on Home Run's ability to obtain full financing. (Ex. A at 9.)

### First Cause of Action
(Declaratory judgment)

28.    Home Run realleges all of the Verified Complaint's allegations.

29.    Home Run is entitled to judgment declaring (a) the contract to have been terminated as of October 18, 2012 upon Herfurth's written acceptance of the oral notice of termination; (b) Defendant waived the cure period; (c) all of Home Run's obligations

to Waking Giants ended on October 18; (d) Home Run has no financial obligations to vendors or service providers with whom Defendant contracted; (e) that Defendant owed Home Run a fiduciary duty; (f) that Defendant violated its fiduciary duties to Home Run by seeking to coerce it into paying monies it does not owe, and, on information and belief, by funneling money designated for Home Run to other projects Defendant was covertly subsidizing by stealing from Home Run; (f) that Defendant breached its contract with Home Run by its numerous failures and acts of nonfeasance and incompetence; and (g) Defendant breached the covenant of good faith and fair dealing.

30.     Inasmuch as Defendant has threatened to try to harm the motion picture and thwart its progress, for which Home Run would have no adequate remedy at law, Home Run is entitled to injunctive relief prohibiting Defendant from (a) contacting or communicating with Home Run's investors; (b) prohibiting Defendant from using Home Run's name in connection with the promotion of Defendant's business; (c) prohibiting Defendant from endeavoring to enjoin the motion picture's production, release, or distribution; (d) requiring Defendant to disgorge the payments it received from Home Run for the services it failed to perform; and (e) such other relief as the Court deems just.

### Second Cause of Action
(Breach of fiduciary duty)

31.     Home Run realleges all of the Verified Complaints allegations.

32.     Defendant's contract and other documents with Home Run purport to create a "partnership" with Home Run. While there was no partnership entity formed between

16

the parties, Defendant describes the relationship as a "partnership for distribution" and states that Defendant "shall be a partner with Home Run . . . ." (Ex. A. at 1.)

33.    Defendant held itself out as more than a service provider dealing at arm's length. Defendant described its approach and relationship with Home Run as one of partnership in the sense of mutual trust and obligation, and thereby undertook a fiduciary duty to Home Run as also evinced by their bizarre organizational chart, which depicted a partnership with Home Run.

34.    Defendant breached its fiduciary duty to Home Run by seeking to coerce it into paying monies it does not owe; by failing to honor its contractual obligations; and by seeking to compel it to pay vendors and service providers with whom Home Run has no privity; and by submitting demands for payment that are, on information and belief, based on fraudulently inflated or totally fabricated invoices.

35.    Defendant, by way of example, incurred a $25,000 debt—which it put on Home Run's tab—for a useless appearance at a film conference at which Home Run was the sole sponsor without a booth. On information and belief, Lokkesmoe used the opportunity to dupe Home Run into subsidizing his appearance at a conference where he furthered his own agendas, which had nothing to do with Home Run.

36.    Additionally, Defendant fabricated charges and invoices for work that was never performed, and, on information and belief, after Home Run ended the contract, Defendant encouraged vendors to charge exorbitant, unsubstantiated fees.

17

### Third Cause of Action
(Breach of contract)

37.    Home Run realleges the Verified Complaint's allegations.

38.    Defendant breached its contract with Home Run by failing to provide the materials it had promised to provide both under the contract and in communications preceding and following the contract; by failing to staff critical meetings and conferences; and by failing to provide every critical obligation it was obliged to fulfill under the agreement including, without limitation, making Home Run its priority.

### Fourth Cause of Action
(Fraud in the inducement)

39.    Home Run realleges the Verified Complaint's allegations.

40.    Defendant fraudulently induced Home Run to enter into a contract with it by fraudulently claiming substantial success, experience, and contacts in the motion picture industry, and that it had numerous existing relationships that it could "leverage" to accomplish the goals of publicizing and distributing the motion picture.

41.    These assertions were fraudulent and made with the intent to deceive Home Run, which justifiably relied on them to its detriment.

### Fifth Cause of Action
(Unjust Enrichment)

42.    Home Run realleges the Verified Complaint's allegations.

43.    Defendant received money for services it failed to provide. Defendant took the money and ran—away from its obligations under the contract.

44.    Defendant has therefore received payment for services it failed to provide.

18

### Sixth Cause of Action
(Breach of the covenant of good faith and fair dealing)

45.   Home Run realleges the Verified Complaint's allegations.

46.   Like every contract, Ex. A contains, implicitly, the covenant of good faith and fair dealing, which operates to prevent Defendant from depriving Home Run of the benefits it reasonably expected under Ex. A, regardless of whether such benefits were expressly set forth in Ex. A.

47.   The covenant also makes it wrongful for Defendant to abuse the contractual relationship to further its interests at Home Run's expense, which Defendant did time and again.

48.   By engaging in the actions and omissions described above, Defendant breached the covenant of good faith and fair dealing.

### Seventh Cause of Action
(Fraud in the inducement as to the status of Waking Giants)

49.   Home Run realleges the Verified Complaint's allegations.

50.   At all times relevant to this action, Defendant held itself out, through its members and the written materials they created, as a limited liability company.

51.   On information and belief based on a nationwide search for Waking Giant's proof of formation, including a search of relevant databases in California, New York, Arizona, and Delaware, which searches were conducted by a licensed private investigator as well as by plaintiff's lawyer, no registration for Waking Giants as an LLC or any other kind of business entity was located.

52.   On information and belief, Waking Giants is not a limited liability

19

company.

53.    On information and belief Waking Giants has no legal status but is merely a fictitious name and front behind which its members were operating.

54.    Defendant's misrepresentation of its legal status was made with the intent to deceive Plaintiff into doing business with it and paying it.

55.    Plaintiff reasonably relief, to its detriment, on Defendant's misrepresentation, and was harmed.

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

1.    On the First Cause of Action, judgment declaring (a) the contract to have been terminated as of October 18, 2012 upon Herfurth's written acceptance of the oral notice of termination; (b) Defendant waived the cure period; (c) all of Home Run's obligations to Waking Giants ended on October 18; (d) Home Run has no financial obligations to vendors or service providers with whom Defendant contracted; (e) that Defendant owed Home Run a fiduciary duty; (f) that Defendant violated its fiduciary duties to Home Run by seeking to coerce it into paying monies it does not owe; (g) injunctive relief prohibiting Defendant from contacting or communicating with Home Run's investors; (h) prohibiting Defendant from using Home Run's name in connection with the promotion of Defendant's business; and (i) prohibiting Defendant from endeavoring to enjoin the motion picture's production, release, or distribution.

2.    On the Second Cause of Action, damages in an amount to be determined at trial, but in no event less than $112,500.00;

20

3.   On the Third Cause of Action, damages in an amount to be determined at trial, but in no event less than $112,500.00;

4.   On the Fourth Cause of Action, damages in an amount to be determined at trial, but in no event less than $500,000, and an award for punitive damages in an amount to be determined at trial but in no event less than $500,000.00;

5.   On the Fifth Cause of Action, damages in an amount to be determined at trial, but in no event less than $112,500.00;

6.   On the Sixth Cause of Action, damages in an amount to be determined at trial, but in no event less than $300,000.00;

7.   On the Sixth Cause of action, restitution of all amounts paid to Defendant and damages in an amount to be determined at trial, but in no event less than $200,000, and an award for punitive damages in an amount to be determined at trial but in no event less than $300,000.00.

8.   Attorney's fees and costs; and

9.   Such additional relief as the Court deems just.

Dated:    New York, New York
          12 December 2012

Theodore L. Blumberg
*Counsel for Plaintiffs*
230 Park Avenue, 10th Floor
New York, New York 10169
(212) 808.7235
tblumberg@blumbergfirm.com

21

## Verification

Theodore L. Blumberg, an attorney admitted to practice before the courts of this State, affirms under CPLR 2106 that I am the plaintiffs' attorney in this case and the foregoing Complaint is true to my own knowledge except as to matters stated on information and belief. As to those matters I believe them to be true. The grounds of my belief about all matters not stated on my knowledge are correspondence and other writings provided by plaintiffs and interviews with officers and employees of plaintiffs. The reason this verification is not made by either plaintiff is that plaintiff Home Run The Movie, LLC is a foreign corporation whose officers live and work outside the State, City, and County of New York.

Affirmed this 12th day of December 2012

Theodore L. Blumberg

Exhibit A



DISTRIBUTION AND MARKETING
PROPOSAL

August 16, 2012

CONFIDENTIAL

Carol Mathews
Executive Producer
Homerun — The Movie
3701- A South Harvard Ave. #308
Tulsa, OK 74135

Carol:

Thank you for taking time with me yesterday to discuss our Proposal. Enclosed is an updated Proposal reflecting our conversations to date.  Specifically, this Proposal eliminates the two phased approach and collapses all activities into a single set.  Waking Giants shall be a partner with Homerun to discern the best distribution model and any potential providers to be utilized.  Within the context of the partnership, expected Waking Giants shall have responsibility for:

1) Theatrical release;
2) Strategic Marketing plan;
3) Execution of marketing activities.

In the partnership for distribution, it is expected the team members are Carol Matthews, Erik Lokkesmoe, Corby Pons, and Ken Herfurth. It is understood Homerun has an attorney, Elsa Ramo, who shall participate as needed and represent Homerun.  The enclosed Proposal provides more details to activities to be accomplished by the team, fees and other related terms.

We hope our Proposal continues to be consistent with our communication and excitement to date.  We are ready to begin work as soon as possible.  We look forward to reviewing with you at your earliest convenience.

With our best regards,

Erik Lokkesmoe, Principal

Ken Herfurth, Principal

Corby Pons, Principal
**Waking Giants**

Last Revised: 8/16/2012                          Waking Giants Media Group, LLC                          Page 1 of 11



DISTRIBUTION AND MARKETING
PROPOSAL

## OVERVIEW:

Over the past few months, the principals of Waking Giants and the principals of Homerun have spent significant time together sharing strategies and motives, goals and outcomes for the success of the motion picture project and beyond. We believe there is a shared motivation and passion for the project, as well as an understanding that in an ever-changing marketplace a new approach is necessary to reach the shared goals. Waking Giants brings proven industry leadership and results, a smart and forward-thinking strategy for marketing and distribution, and a deep affinity and connection to the target audience. Waking Giants is pleased to present this Proposal for the distribution and marketing of Homerun.

Several motives drive this Proposal. For Homerun, the motive is to partner with like-minded individuals with the necessary skill sets and relationships to effectively market and distribute the film while working to maximize a return for the investors and maximize impact to the market. For Waking Giants, the motive is to partner with like-minded individuals with an excellent product being able to bring customized distribution and marketing services to maximize the benefit to the market, investors and the people Waking Giants is directly serving. The partnership is intended to be an 'all-in' approach where the team members work together to make the best decisions on behalf of Homerun. Given these motives, Waking Giants believes both parties are highly aligned and have the requisite foundation of relationship, strategic, business and execution expertise to meet Homerun's goals and aspirations.



## DEVELOPMENT PROCESS:

Waking Giants will be focused on three core elements in the development process for Homerun. These are:

### Discovery and Collaboration

- A comprehensive, coordinated, and consistent campaign begins with a team that shares its purpose and passion. Early, regular, and on-going interactions will enable us to explore all facets of the movie, its existing opportunities and relationships, and the potential challenges and successes. The goal is for the team to have full insight, trust, and confidence in how to make great decision and how to deliver results together.

### Interpretation and Strategic Development

- Waking Giants will be leveraging all of its existing strategies, relationships, contacts, experience, and ideas to explore every possible "business model" for Homerun. The collection and interpretation of research and data, experience and ideas will create numerous plans — which will be further refined and presented to determine, in collaboration with Homerun, the best architecture and execution for the movie.

### Strategy and Execution Framework

- Next, an execution framework, timeline and budget will be provided in detail. The "gameplan" will be created to guide the overall distribution and marketing, while creating enough flexibility to notice and to exploit all new opportunities that will likely surface.



DISTRIBUTION AND MARKETING
PROPOSAL

**ENGAGEMENT:**

The relationship between Waking Giants and Homerun shall begin promptly upon consummation of this agreement.

**RESPONSIBILITIES:**

As partners with Homerun, *Waking Giants shall provide the following distribution and marketing services:*

1. Direct and active participation as part of the leadership team along with Carol Mathews to develop, design and execute distribution and marketing for Homerun.
2. A comprehensive budget supporting the distribution and marketing plan for the project.
3. A custom best in breed (as defined by the team) and complete domestic and foreign release of Homerun – including theatrical, home entertainment, VOD, digital, broadcast, foreign, and licensing – in a way that maximizes audience potential and advances "movement" behind movie.
4. Creation and execution of a comprehensive, coordinated and compelling marketing campaign.
5. Management and execution of a national audience acquisition, activation, and acceleration campaign that moves target audiences from awareness to action.
6. Plan, establish and execute a model to catch the audience to take action.

Waking Giants shall have direct responsibility to execute:
- All marketing activities incorporated in the distribution plan
- Any theatrical distribution plan.

Activities to be completed by the team include but are not limited to:

**Preparation, Executive and Handoff:**
- Leadership roles, team identification and development
- Facilitation exercises as necessary
- Strategy and execution planning exercises and development
  - Identification of essential relationships and ownership
- Budgeting of plans driving total required P&A funds
- Project planning and management
- Application for rating from MPAA
  - Assist in re-edit, if needed, based on marketing or rating feedback
- Master Print Fees – VPF Fees, manufacturing (digital or print) and fulfillment
- Expansion and scenario planning
- Orchestrated handoff to long term 'movement' owner

**Funding:**

# WAKING GIANTS

DISTRIBUTION AND MARKETING
PROPOSAL

- Assisting in the creation, development and review of materials to present to investors for the purpose of funding Homerun's distribution plans;
- Including review of current financial modeling, production financial agreements, waterfall analysis;
- Reviewing existing P&A investment structure, corresponding document review, and providing recommendations;
- Participating directly in investor conversations and meetings.
- Assist in establishing extended funding model in case of broader theatrical release

**Reporting:**
- Budget management
  - o   Associated bank accounts, accounting, invoice management, etc.
- Investor support and updates
- Producer's Reports

**Creative (Marketing and Advertising):**
- Early preparation for the distribution and marketing plans in order to maximize long-lead opportunities, partnerships, and publicity.
- Market research and identification of sub-markets, messaging to multiple markets
  - o   Church and faith based plan
  - o   Pre-sales through identified markets
- Creative/Messaging (key art, one-sheet, trailers, other collateral material)
- One-Sheet and Trailer placement
- Website and messaging review, oversight and integration
  - o   Managing Rollout/maturation/changes over time
- Alternative revenue streams (other products)
- Study Guides/Conversation Guides/Leader Guides
- Publicity (national, regional, and local, faith and general market)
- Partnerships (large, effective marketing partners – Young Life, Celebrate Recovery, Retail)
- Social (custom digital solutions)
- Web/Mobile (activation platforms)
- Grassroots Data Acquisition
- Field Reps (localized reps in key markets)
- Advertising (digital, broadcast, radio, podcast, print and other)
- Promotions
- Screening Programs
- Celebrate Recovery Assistance – Batting 1000

**Theatrical:**
- Theater Identification

- Booking, partnering, reporting, and collecting theatrical release (800+ screens targeted)
- Exhibitor relations and trade liaison
- Foreign Release Exploration and Delivery

**DVD, VOD, Streaming, Digital:**
- DVD, VOD, and Digital plans including any build, negotiations and delivery
- DVD, VOD, Streaming and Digital final version and print
- Ancillary DVD material selection, oversight and orchestration; integrated previews (product placement)

**Broadcast and Syndication:**
- Broadcast and syndication plans including any build, negotiations and delivery

**Retail:**
- Retail model, partnerships, bundling, rollout and management
- Placement, negotiations, scheduling, and delivery

**Group:**
- Group model and partnerships
- Group licensing.

*Working primarily through Carol Mathews, Homerun shall be responsible for the following:*
- Create and outline specific activities requiring Waking Giants marketing support services;
- Provide scheduled updated information and feedback as needed and determined by Waking Giants and Homerun;
- Own any and all relationships with investors and provide primary investor support services;
- Provide all investor relationships and opportunities for the project. Active participation as needed as a part of oversight team for project
- Ownership of identified essential relationships
- Investor relations
- As needed approvals
- Any required legal and contractual documents
  - o Clean chain of title for film
  - o Union sign-offs
  - o Legal opinions, if needed
- Financial model and waterfall
- Revenue bank accounts
- Distributions and accounting management

- Related tax documents, if needed

An example of the Scope of Work (SOW) shall include:
  - Planning, Design, and Counsel
    - o In-person and on-phone meetings between HOME RUN and WAKING GIANTS to build "game plan" for distribution and marketing.
    - o Creation of first draft of game plan.
    - o Activation of execution team (publicity, church outreach, digital, creative, etc.).
    - o Providing on-going counsel for decision-making.
    - o Official kick-off starting with an offsite orchestrated around (before or after) closing of funding for distribution.
  - Long-lead Marketing & Publicity
    - o Activating publicity for release date, profile interviews and features, and early work on EPK, if not already existing.
    - o Early oversight, development/re-designing of HOME RUN website.
    - o Launch/re-design social platforms.
    - o Prepare call-to-action collateral/platforms for Summit response, such as DemandTheMovie.com.
    - o Audit of all creative, begin edits.
    - o Create positioning narrative and final synopsis, message points and log line.
  - Distribution Planning
    - o Review of all potential release dates, tentative selection of release date.
    - o Overview of comps, creating of target 800 theaters.
  - Financial
    - o Audit and alignment of financial modeling, structure and investor documents for initial raise and distribution funding.
    - o Creation of pitch deck and requisite materials for investor meetings.
    - o Attending meetings and pitches with investors.
    - o Identify closing cycle and activities to close funding on time.
    - o Aiding in the vetting, review, structure, and closing of additional investors.

We currently expect the deliverables during the first 60 days of this engagement to include:
  - Capital raised for distribution plan by end of September with direct participation of HOME RUN and Waking Giants.
  - First Draft of HOME RUN Game Plan which may include other third party providers.



DISTRIBUTION AND MARKETING
PROPOSAL

- Activation of core team.
- Publicity support for long-lead press and announcements.
- Early development of social and web platforms.
- Polish on messaging, creative, and collateral.



## PROJECT FEES

Given the conversations to date, Homerun and Waking Giants desire to begin immediately.

The fixed price for Waking Giants' services for this Proposal is $750,000. This price includes Waking Giants participation in all activities outlined in this proposal including marketing, theatrical, retail, VOD and other distribution methods outlined.

Payment terms are: $37,500 upon signing this Proposal, and $75,000 per month paid on the 10th of each month. One last payment of $37,500 shall be made on June 10th, 2013. Waking Giants shall submit an invoice by the 1st of each month for billing.

Travel and entertainment expenses shall be pre-approved by Homerun and reimbursed on monthly increments with appropriate expense reporting.

Professional fees required to complete any of the above activities listed (legal, accounting, and others) are not included in Waking Giant's services.

A summary of fees is provided below.

## PROJECT FEE RECAP - Subject to all applicable taxes

| Total Services | One-Time Fee |
|---|---|
| Upon Signing | $37,500 |
| By September 10th, 2012 (monthly thereafter) | $75,000 |
| Last Payment scheduled for June 10th, 2013 | $37,500 |
| **TOTAL** | **$750,000** |

## PROJECT TERMS

The term of this agreement is expected to be 10 months subject to realization of investment for P&A funding for the project.

Waking Giants shall disclose to Home Run any transactions or potential transactions involving vendors closely held, owned or affiliates of Waking Giants.

Waking Giants shall receive a credit as the distribution company for the film in North America with other credits (international or other) dependent upon actual implementation.

In the event that either party believes that the other materially has breached any obligations under this Proposal or for non-performance, such party shall notify the breaching party in writing. The breaching party shall have fifteen (15) days from the

WAKING
GIANTS

DISTRIBUTION AND MARKETING
PROPOSAL

receipt of notice to cure the alleged breach or non-performance. Both parties agree to work in good faith to assist each other to remedy any breach or non-performance. If the breach or non-performance is not cured within fifteen (15) days, the non-breaching party shall have the right to terminate the Proposal without further notice.



DISTRIBUTION AND HANDLING
PROPOSAL

| CLIENT INFORMATION | WAKING GIANTS PROJECT CONTACTS |
|---|---|
| Client Contact: Carol Mathews<br>Project: Homerun the Movie, LLC<br>Tasks: Distribution and Marketing Services | Strategic Lead:  Erik Lokkesmoe<br>Support:   Corby Pons, Ken Herfurth |

## AGREEMENT & EXECUTION

By executing the following, both parties agree to proposed terms outlined.  Upon signing this agreement, both parties expect to begin immediately.  Concurrently, both parties will work with representation to formalize a contract reflective of the terms and conditions aligned with such a Proposal.  The parties hereto each acting with proper authority have executed this Proposal.

*Homerun the Movie, LLC*                    *Waking Giants, LLC*

_____                    _____
Full Name                                   Full Name


_____                    _____
Signature                                   Signature


_____                    _____
Date                                        Date

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. 654220/12

HOME RUN THE MOVIE, LLC

      Plaintiff,

   -against-

WAKING GIANTS MEDIA GROUP, LLC, dba
WAKING GIANTS, LLC

      Defendant.

## First Amended Verified Complaint

Theodore L. Blumberg
Counsel for Plaintiff
230 Park Avenue, Suite 1000
New York, N.Y. 10169
212.808.7235

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:00 PM 08/22/2012
FILED 12:00 PM 08/22/2012
SRV 120961005 – 5202498 FILE

# STATE *of* DELAWARE

# LIMITED LIABILITY COMPANY

# CERTIFICATE *of* FORMATION

## Waking Giants Media, LLC

**FIRST.** The name of the limited liability company is Waking Giants Media, LLC

**SECOND.** The address of its registered office in the State of Delaware is 1521 Concord Pike #301, Wilmington, DE 19803, County of New Castle. The name of its Registered agent at such address is United States Corporation Agents, Inc.

**IN WITNESS WHEREOF,** the undersigned has executed this Certificate of Formation on the date below.

Date: August 21, 2012

/s/ Eileen Gallo
LegalZoom.com, Inc., Organizer
By: Eileen Gallo, Assistant Secretary
LDA #0104 in Los Angeles County (expires 12/2013)
101 N. Brand Blvd., 11th Floor, Glendale, CA 91203
(323) 962-8600



EXHIBIT
3

FILED: NEW YORK COUNTY CLERK 12/04/2012

NYSCEF DOC. NO. 1

INDEX NO. 654220/2012

RECEIVED NYSCEF: 12/04/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------X

HOME RUN THE MOVIE, LLC

               Plaintiff,

        -against-

                               Index No.

WAKING   GIANTS   MEDIA   GROUP,
LLC dba WAKING GIANTS, LLC,

              Defendant.

---------------------------------------------------------------X

### SUMMONS

     To defendant: You are hereby summoned and required to serve plaintiff a verified answer to the Verified Complaint in this action within twenty days after the service of this summons, exclusive of the day of service, or within thirty days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint. The basis of the venue is defendant's principal place of business, which is 247 W. 30th St., 4th Fl., New York, NY 10001.

Dated:     New York, NY
          3 December 2012

                                Theodore L. Blumberg
                                230 Park Ave., 10th Floor
                                New York, NY 10169
                                212.808.7235
                                *Counsel for Plaintiff*



EXHIBIT
4

FILED: NEW YORK COUNTY CLERK 12/17/2012
NYSCEF DOC. NO. 3

INDEX NO. 654220/2012
RECEIVED NYSCEF: 12/17/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------ X
HOME RUN THE MOVIE, LLC                          :
                    Plaintiff,                   :
                                                 :
        -against-                                :
                                                 :
                                                 :       Index No.      654220/12
WAKING   GIANTS   MEDIA   GROUP,                 :
LLC dba WAKING GIANTS, LLC,                      :
                                                 :
                    Defendant.                   :
                                                 :
------------------------------------------------ X

## SUMMONS

        To defendant: You are hereby summoned and required to serve plaintiff a verified answer to the First Amended Verified Complaint in this action within twenty days after the service of this summons, exclusive of the day of service, or within thirty days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint. The basis of the venue is defendant's principal place of business, which is 247 W. 30th St., 4th Fl., New York, NY 10001.

Dated:      New York, NY
            12 December 2012


                            Theodore L. Blumberg
                            230 Park Ave., 10th Floor
                            New York, NY 10169
                            212.808.7235
                            *Counsel for Plaintiff*

## AFFIRMATION OF SERVICE

I, Evangelos Michailidis, declare under penalty of perjury that I have served a copy of the attached Notice of Removal upon Theodore L. Blumberg, attorney for Plaintiff, whose address is 230 Park Avenue, 10th Floor, New York, New York 10169, by mail.

Dated this 3rd day of January, 2013.


/s/ Evangelos Michailidis
Evangelos Michailidis

4



# NYSCEF - New York County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court / Court of Claims cases.  The NYSCEF site has received your electronically filed document(s) for:

**HOME RUN THE MOVIE, LLC - v. - WAKING GIANTS MEDICA GROUP , LLC**

**654220/2012**

## Documents Received

| Doc # | Document Type | Motion # | Date Received |
|---|---|---|---|
| 6 | NOTICE OF REMOVAL / REMAND | | 01/03/2013 05:11 PM |

## Filing User

| | | | |
|---|---|---|---|
| Name: | **EVANGELOS MICHAILIDIS** | | |
| Phone | **212-471-1864** | E-mail Address: | **emichailidis@duanemorris.com** |
| Fax #: | **212-692-1020** | Work Address: | **1540 Broadway** |
| | | | **New York, NY 10038** |

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 01/03/2013 05:11 PM :

**BLUMBERG, THEODORE - tblumberg@blumbergfirm.com**

**MICHAILIDIS, EVANGELOS - emichailidis@duanemorris.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

---

E-mail: EFile@nycourts.gov     Phone: (646) 386-3033     Fax: (212) 401-9146     website: www.nycourts.gov/efile

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | | |
|---|---|---|
| HOME RUN THE MOVIE, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | Index No. 654220-2012 |
| | ) | |
| WAKING GIANTS MEDIA GROUP, | ) | |
| LLC d/b/a WAKING GIANTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF FILING NOTICE OF REMOVAL

PLEASE TAKE NOTICE that on the 3rd day of January, 2013, the above-named Defendant filed a Notice of Removal, together with copies of all process, pleadings, and orders filed in the above-captioned action, with the Clerk of the United States District Court for the Southern District of New York, Case No. 13-CV-0073.  A true and correct copy of Defendant's Notice of Removal is attached hereto as Exhibit 1.

Respectfully Submitted,

/s/Evangelos Michailidis
Evangelos Michailidis
Duane Morris LLP
1540 Broadway
New York, New York 10036-4086
Telephone:  (212) 471-1864
Facsimile:  (212) 214-0650
emichailidis@duanemorris.com
**ATTORNEY FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of January, 2013, I caused to be served a true and correct copy of the foregoing document, together with the attached Notice of Removal filed on January 3, 2013 in the United States District Court for the Southern District of New York, by mailing such document to:

Theodore L. Blumberg
230 Park Avenue, 10th Floor
New York, New York 10169
**ATTORNEY FOR PLAINTIFF**


/s/ Evangelos Michailidis
Evangelos Michailidis

2